**James E. WILSON, Plaintiff-Appellee,**

v.

**Cathy STOCKER, in her capacity as District Attorney for District No. Four, State of Oklahoma, Defendant,**

**Robert H. Henry, in his capacity as Attorney General for the State of Oklahoma, Defendant-Appellant.**

**James E. WILSON, Plaintiff-Appellee,**

v.

**Cathy STOCKER, in her capacity as District Attorney for District No. Four, State of Oklahoma, Defendant-Appellant,**

**Robert H. Henry, in his capacity as Attorney General for the State of Oklahoma, Defendant.**

Nos. 85–2323, 85–2641 and 85–2736.

United States Court of Appeals, Tenth Circuit.

May 14, 1987.

944

John Galowitch, Asst. Atty. Gen., State of Okl., Oklahoma City, Okl., for defendant-appellant Turpen.

William S. Flanagan, Asst. Dist. Atty., El Reno, Okl., for defendant-appellant Stocker.

Mark E. Hammons (C. Elaine Hammons, with him on the brief) of Hammons & Hammons, El Reno, Okl., for plaintiff-appellee.

Before SEYMOUR, McWILLIAMS, and BARRETT, Circuit Judges.

SEYMOUR, Circuit Judge.

James Wilson was arrested and detained by the El Reno, Oklahoma, police department for distributing anonymous campaign literature in violation of a state statute. While the matter was still under investigation and before formal charges had been filed, Wilson brought this suit under 42 U.S.C. § 1983 (1982). Wilson asserted that the statute infringed his First Amendment rights and sought declaratory and injunctive relief, naming as defendants in their official capacities the District Attorney for the district in which the arrest took place and the Oklahoma Attorney General.[1] The district court granted Wilson's motion for summary judgment, ruling that the challenged statute was facially overbroad. The court also awarded Wilson attorney's fees under 42 U.S.C. § 1988 (1982) and directed that half of the total award be assessed against each defendant.

---

1. When the Attorney General and District Attorney left their offices, their successors were substituted pursuant to Fed.R.App.P. 43(c).

On appeal, the Attorney General asserts that no case or controversy exists between his office and Wilson,[2] that the statute at issue is constitutional, and that the court erred in awarding attorney's fees against him. The District Attorney asserts prosecutorial immunity as a bar to the award of attorney's fees against her or, alternatively, asserts that special circumstances made such an award unjust in this case. We are not persuaded by any of defendants' arguments and affirm the district court's decision.

## I.

### CASE OR CONTROVERSY

The Attorney General argues vigorously that this suit does not create a case or controversy as to him because his office played no part in Wilson's arrest, did not threaten Wilson with enforcement of the statute, and allegedly did not intend to enforce the statute against him. This argument misperceives both the relevant Supreme Court cases and an attorney general's role in suits of this nature.

■ Under Article III of the Constitution, a suit seeking declaratory relief is only justiciable in federal court when "the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941). "The difference between an abstract question and a 'case or controversy' is one of degree, of course, and is not discernible by any precise test." *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 297, 99 S.Ct. 2301, 2308, 60 L.Ed.2d 895 (1979). In making this evaluation, courts examine the immediacy of the threat of harm to a plaintiff in light of the nature of the statute the

plaintiff seeks to challenge. *See, e.g., Steffel v. Thompson*, 415 U.S. 452, 459, 94 S.Ct. 1209, 1216, 39 L.Ed.2d 505 (1974). A plaintiff who shows that his "fear of criminal prosecution under an allegedly unconstitutional statute is not imaginary or wholly speculative," *Babbitt*, 442 U.S. at 302, 99 S.Ct. at 2310, and who challenges "those specific provisions of state law which have provided the basis for threats of criminal prosecution against him," *Steffel*, 415 U.S. at 459, 94 S.Ct. at 1216, need not suffer actual arrest or prosecution to establish a case or controversy, *Babbitt*, 442 U.S. at 302, 99 S.Ct. at 2311.

■ In this case, Wilson was arrested for violating the statute he now challenges. Moreover, he has presented sworn testimony that he wishes to continue the conduct which precipitated his arrest, but has not done so for fear of rearrest. *Compare Steffel*, 415 U.S. at 459–60, 94 S.Ct. at 1216 (controversy exists if plaintiff desires to continue conduct barred by statute), *with Golden v. Zwickler*, 394 U.S. 103, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969) (no controversy when plaintiff's reason for violating statute no longer exists). Thus, Wilson asserts not only the threat of future prosecution, but an ongoing injury resulting from the statute's chilling effect on his desire to exercise his First Amendment rights.

Notwithstanding Wilson's showing under the applicable law, the Attorney General argues that no controversy exists vis-a-vis his office because he has taken no action to enforce that statute against Wilson. Given Wilson's demonstration of appreciable injury, the question turns on whether the Attorney General's legal interest is substantial and adverse to that of Wilson.

We begin our analysis of this issue by pointing out that the Supreme Court has often found a case or controversy between a plaintiff challenging the constitutionality of a statute and an enforcement official

---

**2.** The Attorney General also asserts on appeal that he is not a necessary or proper party under Fed.R.Civ.P. 19 or 20, and that he therefore should have been dismissed early in the litigation. The crux of the Attorney General's argument on this issue is that he does not belong in

the suit because his office was not actively involved in enforcing the statute at issue against Wilson. This contention does no more than assert that no case or controversy exists with respect to him. Accordingly, our discussion of that issue is dispositive of this claim as well.

who has made no attempt to prosecute the plaintiff under the law at issue. In *Doe v. Bolton*, 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973), the Court found a justiciable controversy between doctors subject to prosecution under criminal abortion statutes and the state attorney general, "despite the fact that the record does not disclose that any one of [the doctors] has been prosecuted, or threatened with prosecution." *Id.* at 188, 93 S.Ct. at 745. Recently, in *Diamond v. Charles*, 476 U.S. 54, 106 S.Ct. 1697, 90 L.Ed.2d 48 (1986), the Court stated that "[t]he conflict between state officials empowered to enforce a law and private parties subject to prosecution under that law is a classic 'case' or 'controversy' within the meaning of Art. III." *Id.* 106 S.Ct. at 1704.

■ The legal principle underlying these decisions is the familiar doctrine that "[a] suit against a state officer in his official capacity is, of course, a suit against the State." *Id.* at 1701 n. 2. Thus a controversy exists not because the state official is himself a source of injury, but because the official represents the state whose statute is being challenged as the source of injury. *See Kentucky v. Graham*, 473 U.S. 159, 105 S.Ct. 3099, 3105–06, 87 L.Ed.2d 114 (1985). In sum, we conclude that a plaintiff challenging the constitutionality of a state statute has a sufficiently adverse legal interest to a state enforcement officer sued in his representative capacity to create a substantial controversy when, as here, the plaintiff shows an appreciable threat of injury flowing directly from the statute.[3]

## II.

## THE CHALLENGE TO THE STATUTE

Wilson was arrested after he had passed out unsigned handbills opposing the election of a candidate for the state senate. Upon Wilson's arrival at the police station, he was presented with a copy of the state statute prohibiting the distribution of anonymous campaign literature. The relevant part of the current version [4] of that statute states:

"*It shall be unlawful for any person,* firm, corporation, partnership, organization, or association *to* broadcast, write, print, post, or *distribute* or cause to be broadcast, written, printed, posted, or distributed *a statement, circular, poster, or advertisement which is designed to influence the voters on the nomination or election of a candidate* or to influence the voters on any constitutional or statutory amendment or on any other issue in a state, county, city, or school district election, or to influence the vote of any member of the Legislature, *unless there appears in a conspicuous place upon such circular, poster, or advertisement,* or within a broadcast statement, either *the name and address of the person* if an individual, or the name and address of the president, chairman, or secretary, or of two officers of the organization, if an organization. Persons violating this act shall be guilty of a misdemeanor. Violators shall include the persons placing the order for unlawful statements, circulars, posters or advertisements and the persons who authorized the same."

---

**3.** The Attorney General also argues that no case or controversy exists by virtue of the affidavit his predecessor filed in the district court stating that although he had not personally read the challenged statute, he did not presently believe Wilson's proposed conduct, as described in the affidavit, was prohibited by the statute. *See* rec., vol. I, at 193–94. Significantly, although the affidavit's description of Wilson's activities mentioned Wilson's desire to undertake anonymous distribution of *media articles,* it made no mention of Wilson's desire to distribute *campaign literature* anonymously. This affidavit, equivocating as it is, would simply not be sufficient to moot this controversy even if the Attor-

ney General's conduct itself were the only source of a live controversy. *Cf. City of Los Angeles v. Lyons,* 461 U.S. 95, 100–01, 103 S.Ct. 1660, 1664, 75 L.Ed.2d 675 (1983). Other material apparently filed in the district court and cited by the parties on this issue has not been made part of the record on appeal.

**4.** The statute under which Wilson was arrested was amended while this action was before the district court. The amendments are not relevant to the issue in this case, and by stipulation of the parties the court ruled on the constitutionality of the current version.

Okla.Stat. tit. 26, § 15–111 (Supp.1985) (emphasis added).

The district court agreed with Wilson's assertion that, under *Talley v. California,* 362 U.S. 60, 80 S.Ct. 536, 4 L.Ed.2d 559 (1960), the statute is overbroad because it infringes upon the right to speak and write freely about political issues by criminalizing anonymous political speech. On appeal, the Attorney General argues that the above statute requires identification only of the person paying for or ordering the material. He then argues that the law as he construes it is unlike the one at issue in *Talley* and is constitutional under the rationale applied by the Supreme Court in *Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976). We are not persuaded.

■■■ In determining the scope of a statute, a court must begin with the statutory language itself. *United States v. Turkette,* 452 U.S. 576, 580, 101 S.Ct. 2524, 2527, 69 L.Ed.2d 246 (1981); *Nevada Power Co. v. Watt,* 711 F.2d 913, 920 (10th Cir. 1983) When the terms of the statute are clear and unambiguous, that language is controlling absent rare and exceptional circumstances. *Howe v. Smith,* 452 U.S. 473, 483, 101 S.Ct. 2468, 2475, 69 L.Ed.2d 171 (1981); *Nevada Power,* 711 F.2d at 920. As is clear from the statutory language italicized above, the provision at issue here unambiguously makes it "unlawful for any person ... to ... distribute ... a statement, circular, poster, or advertisement ... unless there appears in a conspicuous place upon such circular, poster, or advertisement ... the name and address of the person." Okla.Stat. tit. 26, § 15–111. The statute by its language applies to one who merely distributes campaign material, and is not limited only to persons authorizing or financing such material.

■■ Courts do not apply the doctrine of facial overbreadth to invalidate a statute when it has been given a sufficient limiting construction. *See Broadrick v. Oklahoma,* 413 U.S. 601, 613, 93 S.Ct. 2908, 2916, 37 L.Ed.2d 850 (1973). When the state court has not construed or interpreted the statute, however, a federal court is relegated to the words of the act itself, because "it is not within our power to construe and narrow state laws." *Grayned v. City of Rockford,* 408 U.S. 104, 110, 92 S.Ct. 2294, 2300, 33 L.Ed.2d 222 (1972);[5] *see also Gooding v. Wilson,* 405 U.S. 518, 520–21, 92 S.Ct. 1103, 1105, 31 L.Ed.2d 408 (1972) (facially overbroad statute that state has not construed narrowly may not be given narrow construction by federal court); *Adamian v. Jacobsen,* 523 F.2d 929, 932 (9th Cir.1975) (same). Accordingly, we decline the Attorney General's invitation to give the statute a construction more restrictive than that provided by its plain language.

We must therefore address the constitutionality of a statute that requires the person distributing campaign material to identify himself. The Supreme Court considered a First Amendment challenge to a virtually identical municipal ordinance in *Talley v. California,* 362 U.S. 60, 80 S.Ct. 536, 4 L.Ed.2d 559. In striking down the provision in *Talley,* the Court stated that "[t]here can be no doubt that such an identification requirement would tend to restrict freedom to distribute information and thereby freedom of expression." *Id.* at 64, 80 S.Ct. at 538. The Court pointed out that "[a]nonymous pamphlets, leaflets, brochures and even books have played an important role in the progress of mankind. Persecuted groups and sects from time to time throughout history have been able to criticize oppressive practices and laws either anonymously or not at all." *Id.* In this case, the uncontroverted record re-

---

**5.** In *Grayned,* the Supreme Court indicated that, in the absence of a limiting construction by the state court, a federal court could consider "perhaps to some degree, ... the interpretation of the statute given by those charged with enforcing it." 408 U.S. at 110, 92 S.Ct. at 2300. The Oklahoma Attorney General is required to give his opinion upon all questions of law appropri-

ately submitted to him. *See* Okla.Stat. tit. 74, § 18b(e) (1981). The only such opinion rendered regarding § 15–111 does not address the issue with which we are concerned. *See* 10 Op.Att'y Gen.Okla. 536 (1978). The local officials who actually arrested Wilson obviously believed that the law applied to persons distributing material that did not identify them.

veals that Wilson and his family were subjected to substantial harassment when his campaigning activity became known. The record supports the reasonable inference that those supporting the candidate whom Wilson opposed played some part in Wilson's arrest, because the candidate's attorney arrived at the police station shortly after Wilson and threatened Wilson with a civil suit as well as criminal prosecution. *See* rec., vol. I, at 233.

■ When, as here, "a law infringes on the exercise of First Amendment rights, its proponent bears the burden of establishing its constitutionality." *ACORN v. Municipality of Golden*, 744 F.2d 739, 746 (10th Cir.1984). The interests of the state in enacting such a law "must survive exacting scrutiny." *Buckley*, 424 U.S. at 64, 96 S.Ct. at 656. The law must be substantially related to a compelling governmental interest, and must be narrowly drawn so as to be the least restrictive means of protecting that interest. *See NAACP v. Alabama*, 357 U.S. 449, 463, 78 S.Ct. 1163, 1172, 2 L.Ed.2d 1488 (1958); *Rosen v. Port of Portland*, 641 F.2d 1243, 1246 (9th Cir. 1981) (citing cases).

■ The Attorney General argues that the Oklahoma law against anonymous campaign literature is analogous to the federal disclosure provisions at issue in *Buckley*, 424 U.S. 1, 96 S.Ct. at 626, and that the state law survives strict scrutiny under *Buckley* because it is narrowly drawn to serve the same interests found compelling in that case. He argues that section 15-111 aids voters in placing a candidate in the political spectrum, deters corruption and the appearance of corruption, discloses interest or bias, assists in preventing fraudulent and misleading campaign material, and assists in collecting data necessary to detect violations of state contribution laws. Unfortunately, the Attorney General's analysis is flawed by his insistence that section 15-111 applies only to those persons financially responsible for political material, a construction that we have rejected as unsupported by the statute's plain language. Because *Buckley* is concerned with federal laws regulating the disclosure of those who make political contributions and expenditures, the rationale applied there is of little help in evaluating a law such as section 15-111, which applies to those who merely distribute campaign literature. The State's interests in preventing the violation of contribution laws and in preventing corruption bear little if any relation to, and therefore are not furthered by, requiring identification of a distributor.

■ Nor can the statute be upheld as necessary to prevent fraud. This justification was specifically rejected by the Court in *Talley*, which pointed out that an identification provision that applies to "all handbills under all circumstances anywhere" is not drawn with the requisite narrowness. 362 U.S. at 64, 80 S.Ct. at 538; *see also id.* 66–67, 80 S.Ct. at 539–40 (Harlan, J., concurring).

■ We turn next to the State's interest in helping the voter to identify a candidate's place in the political spectrum and in disclosing bias or interest. We agree with Wilson's observation on appeal that the interest in an informed electorate existed in *Talley* and exists in every challenge to identification requirements. Indeed, the Court in *Talley* indicated that required disclosure may actually impede rather than further the circulation of information necessary to inform the public because "identification and fear of reprisal might deter perfectly peaceful discussions of public matters of importance." *Id.* at 65, 80 S.Ct. at 539.

> "Unquestionably, the lifeblood of today's political campaigning must be the work of volunteers. The oppressive financial burden of campaigns makes reliance on volunteers absolutely essential and, in light of the enormous significance of citizen participation to the preservation and strength of the democratic ideal, absolutely desirable, indeed indispensable. Offensive to the sensibilities of private citizens, identification requirements ... even in their least intrusive form, must discourage that participation."

*Hynes v. Mayor of Oradell*, 425 U.S. 610, 626–28, 96 S.Ct. 1755, 1763–64, 48 L.Ed.2d 243 (1976) (Brennan, J., concurring in part).

We recognize that compelled disclosure of campaign contributions was upheld in *Buckley* even though it could deter the free flow of political ideas. *See* 424 U.S. at 70–72, 96 S.Ct. at 659–60. However, "information 'as to where political campaign money comes from and how it is spent by the candidate,'" *id.* at 66, 96 S.Ct. at 657, is far more valuable in assessing a candidate than is the identity of those distributing campaign literature, *cf. id.* at 66–67, 96 S.Ct. at 657 (financial disclosure more helpful than party labels and campaign speeches). Moreover, the Court in *Buckley* did not retreat from its holding in *Talley.* Indeed the Court pointed out that the provision in *Talley* was infirm despite the claim that it was aimed at preventing fraud, *id.* at 81, a governmental interest that is clearly an aspect of promoting an informed electorate. *Talley* is distinguishable as involving "a disclosure law not narrowly limited to situations where the information sought has a substantial connection with the governmental interest sought to be advanced." *Hynes,* 425 U.S. at 626 n. 2, 96 S.Ct. at 1763 (Brennan, J., concurring in part); *see also Rosen,* 641 F.2d at 1251 (*Buckley* a narrow, limited exception to *Talley*).

■ The circumstances of this case are virtually indistinguishable from those in *Talley.* Here, as in that case, "compelled disclosure has the potential for substantially infringing the exercise of First Amendment rights." *Buckley,* 424 U.S. at 66, 96 S.Ct. at 657. In addition, disclosure of the identity of those distributing political literature does not significantly further an informed electorate, and may actually hinder rather than promote that goal. Under the holding in *Talley,* the law at issue here cannot stand.[6]

---

6. We reject the Attorney General's attempt to analyze § 15–111 as a time, place, and manner regulation. Our conclusion that the statute is not narrowly tailored to further the governmental interests asserted is dispositive. *See Clark v. Community for Creative Non-Violence,* 468 U.S. 288, 293–94, 104 S.Ct. 3065, 3069, 82 L.Ed.2d 221 (1984). Moreover, "[r]estraints implicit in identification requirements ... extend beyond restrictions on time and place—they chill discussion itself. [This] type of ordinance there-

fore raises substantial First Amendment questions not presented by the usual time, place, and manner regulation." *Hynes,* 425 U.S. at 628, 96 S.Ct. at 1764 (Brennan, J., concurring in part).

7. We note that the Eleventh Amendment does not preclude an award of attorneys fees under 42 U.S.C. § 1988 against the Attorney General. *Hutto v. Finney,* 437 U.S. 678, 693–700, 98 S.Ct. 2565, 2574–78, 57 L.Ed.2d 522 (1978).

---

## III.

## ATTORNEY'S FEES

The district court awarded Wilson $20,470 in witness and attorney's fees, apportioning one-half to each defendant. The defendants do not challenge the amount of the award on appeal. Instead, the District Attorney contends that prosecutorial immunity bars a fee award against her, and both defendants argue that special circumstances make an award in this case unjust.

■ The District Attorney's invocation of prosecutorial immunity is without merit and may be disposed of summarily. In *Supreme Court of Virginia v. Consumers Union of the United States, Inc.,* 446 U.S. 719, 100 S.Ct. 1967, 64 L.Ed.2d 641 (1980), the Supreme Court stated that although prosecutors are absolutely immune from damage awards, they are subject to suits for injunctive relief under section 1983, *id.* at 736–37, 100 S.Ct. at 1977, and that section 1988 authorizes a fee award to prevailing plaintiffs in such suits, *id.* at 737, 100 S.Ct. at 1977. *Cf. Pulliam v. Allen,* 466 U.S. 522, 543–44, 104 S.Ct. 1970, 1981, 80 L.Ed.2d 565 (1984) (judicial immunity no bar to fee award in suit for injunctive relief). "Accordingly, enforcement authorities against whom § 1983 judgments have been entered would ordinarily be charged with attorney's fees."[7] *Consumers Union,* 446 U.S. at 738, 100 S.Ct. at 1977.

We thus turn to defendants' argument that special circumstances render a fee award unjust in this case. Before we address each defendant's contentions individually, we believe it appropriate to briefly discuss the role Congress intended section 1988 to play in the enforcement of the civil

rights acts to which it applies. Section 1988 provides:

"In any action or proceeding to enforce a provision of sections 1981, 1982, 1983, 1985, and 1986 of this title, title IX of Public Law 92–318, or title VI of the Civil Rights Act of 1964, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs."

42 U.S.C. § 1988 (1982).

In enacting section 1988, Congress pointed out that

"[a]ll of these civil rights laws depend heavily upon private enforcement, and fee awards have proved an essential remedy if private citizens are to have a meaningful opportunity to vindicate the important Congressional policies which these laws contain.

"In many cases arising under our civil rights laws, the citizen who must sue to enforce the law has little or no money with which to hire a lawyer. If private citizens are to be able to assert their civil rights, and if those who violate the Nation's fundamental laws are not to proceed with impunity, then citizens must have the opportunity to recover what it costs them to vindicate these rights in court."

S.Rep. No. 1011, 94th Cong., 2d. Sess. 2, *reprinted in* 1976 U.S.Code Cong. & Admin.News 5908, 5910.

In stating that fee awards are to be an integral part of the remedies necessary to obtain compliance with the civil rights laws, Congress specifically recognized that

"defendants in these cases are often State or local bodies or State or local officials. In such cases it is intended that the attorneys' fees, like other items of costs, will be collected either directly from the official, in his official capacity, from funds of his agency or under his control, or from the State or local government (whether or not the agency or government is a named party)."

*Id.* at 5913 (footnotes omitted).

In view of this clearly expressed congressional intent, we have held that the district court's discretion to deny fees to a prevail-ing plaintiff is quite narrow. *See, e.g., J & J Anderson, Inc. v. Town of Erie,* 767 F.2d 1469, 1474 (10th Cir.1985); *Chicano Police Officer's Ass'n v. Stover,* 624 F.2d 127, 130 (10th Cir.1980). "[T]here are few cases denying attorney fees to a prevailing party as unjust under § 1988," *J & J Anderson,* 767 F.2d at 1474, and "[a] strong showing of special circumstances is necessary to support [such] a denial," *id.*

■ The Attorney General urges that special circumstances exist because his office has done nothing to enforce the state statute at issue. However, we have specifically held that neither failure to take official action to enforce a statute, nor official assurance that the law would not be enforced are special circumstances rendering an award unjust. *See In re Kansas Congressional Districts Reapportionment Cases,* 745 F.2d 610, 612–13 (10th Cir.1984). We there pointed out that "[f]ee awards against enforcement officials are run-of-the-mill occurrences, even though, on occasion, had a state legislature acted or reacted in a different or more timely manner, there would have been no need for a lawsuit or for an injunction." *Id.* at 612 (quoting *Consumers Union,* 446 U.S. at 739, 100 S.Ct. at 1978). Here, as in *In re Kansas* and *Consumers Union,* the alleged special circumstances amount to no more than assertions that the Attorney General has acted in good faith, a ground overwhelmingly rejected by the courts. *See, e.g., J & J Anderson,* 767 F.2d at 1474; *Kirchberg v. Feenstra,* 708 F.2d 991, 999 (5th Cir.1983); *Teitelbaum v. Sorenson,* 648 F.2d 1248, 1250–51 (9th Cir.1981). Allowing the circumstances offered by the Attorney General here to justify denial of attorney's fees would conflict with controlling case law and defeat the purpose of section 1988, which is not designed to penalize defendants but to encourage injured individuals to seek relief. *See Teitelbaum,* 648 F.2d at 1251.

■ We likewise find no merit in the special circumstances offered by the District Attorney. She contends that a fee award against her is unjust because the

statute at issue does not pose a significant threat to the public interest, and because her role in the litigation has been to develop the law and the facts. We cannot agree that section 15–111 does not pose a significant threat to the public interest, infringing as it does upon rights accorded the highest degree of protection under the First Amendment. Moreover, "[a]ttorney's fees are not to be denied under § 1988 merely because the action provided a private benefit to the plaintiff rather than a public benefit to a class of similarly situated persons." *J & J Anderson*, 767 F.2d at 1474.

The District Attorney's assertion that fees are unjust because her participation in the litigation helped develop the law and the facts is also unpersuasive. A party to litigation almost always aids in such development. Accepting this assertion as a special circumstance would render a fee award unjust in virtually every case, a result undeniably contrary to the congressional intent that fee awards be "an integral part of the remedies necessary" to obtain compliance with the civil rights laws. *See* S.Rep. No. 1011, 1976 U.S.Code Cong. & Admin.News at 5913.

AFFIRMED.