<head>

<title>USCA1 Opinion</title>

<style type="text/css" media="screen, projection, print">

<!--

@import url(/css/dflt_styles.css);

-->

</style>

</head>

<body>

                United States Court of Appeals
                    For the First Circuit

No. 99-1812

          RHODE ISLAND ASSOCIATION OF REALTORS, INC.,

                      Plaintiff, Appellee,

                               v.

              SHELDON WHITEHOUSE, ATTORNEY GENERAL
                 FOR THE STATE OF RHODE ISLAND,

                     Defendant, Appellant.

          APPEAL FROM THE UNITED STATES DISTRICT COURT

                FOR THE DISTRICT OF RHODE ISLAND

          [Hon. Ernest C. Torres, U.S. District Judge]

                             Before

                     Selya, Circuit Judge,
                                
                Coffin, Senior Circuit Judge,
                                
                  and Boudin, Circuit Judge.
                                
                                
                                
    Rebecca Tedford Partington, Asst. Attorney General, with whom
Brenda A. Doyle, Special Asst. Attorney General, was on brief, for
appellant.
    Mark W. Freel, American Civil Liberties Union, Rhode Island
Affiliate, for appellee.

December 14, 1999

                                
 SELYA, Circuit Judge.  Certain public records in Rhode
Island are available upon request but come with strings attached.  
This case concerns one of those strings:  the prohibition on using
records so obtained for commercial solicitation.  See R.I. Gen.
Laws  38-2-6.  Responding to a petition for declaratory and
injunctive relief filed by the Rhode Island Association of Realtors
(the Association), the district court granted the requested
remedies, ruling that the operation of the statute abridged the
Association's right to free expression.  See Rhode Island Ass'n of
Realtors v. Whitehouse, 51 F. Supp. 2d 107 (D.R.I. 1999) [RIAR].  
The Rhode Island Attorney General appeals, insisting that the
Association lacks standing to challenge the law.  We affirm.
I.  BACKGROUND
 In accordance with the conventional summary judgment
standard, we limn the facts in the light most favorable to the
Attorney General, indulging all reasonable inferences in his favor.  
See Coyne v. Taber Partners I, 53 F.3d 454, 456 (1st Cir. 1995).
 The Association is a trade group that represents licensed
real estate agents and brokers.  Pursuant to the Access to Public
Records Act, R.I. Gen. Laws  38-2-1 to -15 (the Act), the
Association asked for and obtained from the Department of Business
Regulation (DBR) information concerning the identities of persons
to whom real estate licenses recently had been issued.  The
Association wishes to use these data to recruit new dues-paying
members but thus far has refrained from soliciting the listed
license-holders because it fears prosecution under R.I. Gen. Laws
38-2-6.
 First enacted in 1979, the statute provides:
   Commercial use of public records.   No person
 or business entity shall use information
 obtained from public records pursuant to this
 chapter to solicit for commercial purposes or
 to obtain a commercial advantage over the
 party furnishing that information to the
 public body.  Anyone who knowingly and
 willfully violates the provision of this
 section shall, in addition to any civil
 liability, be punished by a fine of not more
 than five hundred dollars ($500) and/or
 imprisonment for no longer than one year.

R.I. Gen. Laws  38-2-6.  When the Association requested the
license information, DBR made it aware of potential criminal
penalties under the Act.  Although no person has ever been charged
criminally under section 38-2-6, the Attorney General has never
disclaimed it, and a related provision, section 38-2-8, requires
the Attorney General to investigate and, when appropriate, to
prosecute violations.
 As a matter of longstanding policy, the Attorney General
does not issue advisory opinions to private parties, so that option
was not open to the Association.  The  Attorney General sometimes
furnishes such opinions to public entities on questions of state
law, see id.  42-9-6, but he has never promulgated an opinion
anent the scope of section 38-2-6.  He has, however, issued at
least one opinion to a state college touching upon the subject
matter.  See R.I. Att'y Gen. Unofficial Op. No. PR94-06 (Apr. 21,
1994) (discussed infra).
 Reluctant either to execute or to abandon its
contemplated deployment of the information gleaned from DBR, and
seeing no other way of resolving the issue, the Association sued.  
Invoking 42 U.S.C.  1983 and the First and Fourteenth Amendments,
it asked the federal district court to declare section 38-2-6
unconstitutional as violative of the free-speech rights of the
Association, its members, and Rhode Island real estate licensees in
general, and to enjoin the then-Attorney General, Jeffrey Pine,
from enforcing the ban on commercial solicitation.
 Attorney General Pine moved to dismiss the complaint.  He
contended that it showed neither a sufficiently definite plan to
engage in conduct that would transgress section 38-2-6 nor a
sufficiently imminent threat of prosecution.  The Association
objected to this motion and in due course filed a cross-motion for
summary judgment.  In opposition, the Attorney General confined his
argument to the threshold question of justiciability:  he
embellished both of the contentions delineated in the motion to
dismiss, suggested that the court should defer to his
interpretation of the challenged law, and alleged a lack of state
action sufficient to support a claim under 42 U.S.C.  1983.  The
Association filed a rejoinder, which included a supporting
affidavit.
 The matter lay fallow for several months.  Attorney
General Pine did not seek reelection.  In November 1998, the voters
chose Sheldon Whitehouse to succeed him.  Whitehouse took office on
January 5, 1999, and was substituted as the named defendant in this
suit.  See Fed. R. Civ. P. 25(d)(1).  In June, the district court
granted the Association's motion for summary judgment.  See RIAR,
51 F. Supp. 2d at 114.  This appeal followed.  Up to that point,
Attorney General Whitehouse had not expressed an opinion as to
either the constitutionality of section 38-2-6 or its applicability
to the Association's proposed course of action.
II.  ANALYSIS
 On appeal, the Attorney General does not challenge the
district court's determination that section 38-2-6 is
unconstitutional to the extent that it "prohibits the use of public
information 'to solicit for commercial purposes.'"  RIAR, 51 F.
Supp. 2d at 114 (quoting statute).  We must therefore accept that
determination unless we find that the Attorney General is correct
in his thesis that the district court should not have heard the
case.
 The Attorney General grounds this position mainly on a
theory that the Association lacked "standing" to pursue its quest
for declaratory and injunctive relief.  But he uses this term
loosely, in a way that brings to mind a panoply of related
concepts:  standing, ripeness, and mootness.  We address these
justiciability concerns separately and then treat the Attorney
General's assertion that the lower court lacked subject-matter
jurisdiction because the operation of section 38-2-6 does not
involve state action.  Consistent with the summary judgment
standard, we afford plenary review.  See Coyne, 53 F.3d at 456.
                         A.  Standing.
 Inasmuch as the Attorney General couches his
justiciability concerns in terms of standing, we start there.  Like
all justiciability doctrines, standing is a necessary concomitant
to the court's power to adjudicate a case.  See Warth v. Seldin,
422 U.S. 490, 498 (1975); United States v. AVX Corp., 962 F.2d 108,
113 (1st Cir. 1992).  Despite its importance, the doctrine remains
"a morass of imprecision."  New Hampshire Right to Life Political
Action Comm. v. Gardner, 99 F.3d 8, 12 (1st Cir. 1996).  We know,
however, that standing encompasses both "constitutional
requirements and prudential considerations," Valley Forge Christian
College v. Americans United for Separation of Church and State,
Inc., 454 U.S. 464, 471 (1982), and that the former derive from
Article III's admonition that a federal court may decide only
actual "Cases" and "Controversies," U.S. Const. art. III,  2.  
Here, the Attorney General frames his objection in constitutional
terms and, in all events, it is unnecessary to address separately
prudential considerations.  See Berner v. Delahanty, 129 F.3d 20,
24 (1st Cir. 1997) ("[A] realistic risk of future exposure to [a]
challenged policy . . . is sufficient to satisfy not only the
standing requirements that Article III imposes, but also the
prudential concerns that sometimes trouble courts."), cert. denied,
523 U.S. 1023 (1998).
 The burden of establishing standing rests with the party
who invokes federal jurisdiction.  See Bennett v. Spear, 520 U.S.
154, 167-68 (1997).  Accordingly, the Association must show that
(1) it personally has suffered some actual or threatened injury,
(2) the injury fairly can be traced to the challenged conduct, and
(3) a favorable decision likely will redress it.  See Valley Forge,
454 U.S. at 472; Vote Choice, Inc. v. DiStefano, 4 F.3d 26, 36 (1st
Cir. 1993).
 Neither the second nor the third of these showings has
independent significance in this instance.  To the extent that the
Association had suffered a cognizable injury at the time of filing
 a matter which we discuss below   that injury can be traced
directly to the looming enforcement of section 38-2-6 and can be
fully redressed by declaratory and injunctive relief.  See New
Hampshire Right to Life, 99 F.3d at 13.  Thus, the lens of our
inquiry narrows to the existence vel non of an actual or threatened
injury.
 Although inquiries of this sort are both context-
contingent and situation-specific, the case law furnishes some
guideposts.  Generally speaking, a "conflict between state
officials empowered to enforce a law and private parties subject to
prosecution under that law is a classic 'case' or 'controversy'
within the meaning of Art. III.'"  Diamond v. Charles, 476 U.S. 54,
64 (1986).  Moreover, a private party need not "first expose
himself to actual arrest or prosecution to be entitled to challenge
a statute that he claims deters the exercise of his constitutional
rights."  Steffel v. Thompson, 415 U.S. 452, 459 (1974).  Because
it ordinarily will be too late to obtain a federal forum once the
state has initiated criminal proceedings, see Younger v. Harris,
401 U.S. 37, 41 (1971), persons who are confronted by criminal laws
of questionable constitutionality should be afforded recourse to
the federal courts as soon as state sanctions have been threatened.  
See ACLU v. Florida Bar, 999 F.2d 1486, 1493 (11th Cir. 1993).  The
threat, however, must be credible.  See New Hampshire Right to
Life, 99 F.3d at 14.  Therein lies the rub.
 We have framed the applicable rule in the following way:
   In a pre-enforcement challenge to a statute
 carrying criminal penalties, standing exists
 when "the plaintiff has alleged an intention
 to engage in a course of conduct arguably
 affected with a constitutional interest, but
 proscribed by [the] statute, and there exists
 a credible threat of prosecution."

Id. (quoting Babbitt v. United Farm Workers Nat'l Union, 442 U.S.
289, 298 (1979)).  In practice, it is often difficult to
distinguish between fears that are chimerical and those that are
realistic.  The best that we have been able to do is to insist
that, in these purlieus, standing requires an "objectively
reasonable" fear of prosecution.  Id.; see also Laird v. Tatum, 408
U.S. 1, 13-14 (1972) (stating that "[a]llegations of a subjective
'chill' [produced by government intelligence-gathering] are not an
adequate substitute for a claim of specific present objective harm
or a threat of specific future harm").  Determining objective
reasonableness demands a frank consideration of the totality of the
circumstances, including the nature of the conduct that a
particular statute proscribes.  See New Hampshire Right to Life, 99
F.3d at 16; cf. Camilo-Robles v. Zapata, 175 F.3d 41, 43 (1st Cir.
1999) (holding that reasonableness for qualified immunity purposes
requires "an objective inquiry into the totality of the
circumstances").
 Here, the Association intends to solicit new members   an
activity protected by the First Amendment, see Innovative Database
Sys. v. Morales, 990 F.2d 217, 220-22 (5th Cir. 1993)   so the
"intention to engage" element is established.  So, too, the
proscription element, because the plain language of section 38-2-6
pretermits commercial solicitation.  Thus, the pivotal question
reduces to whether the Association faced a credible threat of
prosecution when it filed suit.  Our search for an answer takes
place against a background understanding that when First Amendment
values are at risk, courts must be especially sensitive to the
danger of self-censorship.  See Virginia v. American Booksellers
Ass'n, 484 U.S. 383, 393 (1988); Meese v. Keene, 481 U.S. 465, 473
(1987).
 We recently canvassed much of the relevant case law, see
New Hampshire Right to Life, 99 F.3d at 14-15, and it would be
pleonastic to rehearse it here.  We reiterate only the bottom line:  
"when dealing with pre-enforcement challenges to recently enacted
(or, at least, non-moribund) statutes that facially restrict
expressive activity by the class to which the plaintiff belongs,
courts will assume a credible threat of prosecution in the absence
of compelling contrary evidence."  Id. at 15; accord North Carolina
Right to Life, Inc. v. Bartlett, 168 F.3d 705, 710 (4th Cir. 1999)
(quoting from this passage), petition for cert. filed, ___ U.S.L.W.
___ (U.S. May 18, 1999) (No. 98-1887); Commodity Trend Serv. v.
CFTC, 149 F.3d 679, 687 (7th Cir. 1998) (same); see also Wilson v.
State Bar of Ga., 132 F.3d 1422, 1428 (11th Cir. 1998) (agreeing
"with the First Circuit's admonition that the credible threat of
prosecution standard 'is quite forgiving'" in the First Amendment
context) (citing New Hampshire Right to Life, 99 F.3d at 14).
 Several factors indicate a credible threat of prosecution
here.  Section 38-2-6 is regulatory in nature, prohibits precisely
the conduct that the Association wishes to undertake, and sets
severe sanctions for noncompliance.  Although the Attorney General
questions the second of these assumptions, there is simply no
plausible way to read the statutory text so that it exonerates the
Association's proposed solicitation.
 This conclusion is buttressed by the circumstances.  For
one thing, the Association was specifically informed about the
existence of section 38-2-6 when it obtained the names of real
estate licensees from DBR.  The clear implication of this direct
monition, particularly when coupled with the unambiguous language
of the statute itself, was that the commercial use of these records
was foreclosed and that transgressions would not go unpunished.  
For another thing, the Attorney General had issued no statement
interpreting the statute to mean anything other than what its plain
language portends.  To the contrary, in response to a request from
Rhode Island College a few years previously, the Attorney General
had opined that although the college could not condition the
release of records upon recipients' certifying that they would not
use the records to solicit for commercial purposes, it could
require recipients to acknowledge their awareness of the commercial
use prohibition contained in section 38-2-6.  See R.I. Att'y Gen.
Unofficial Op. No. PR94-06.
 The precise wording of this portion of the opinion is
revealing.  After reprinting section 38-2-6 in full, the Attorney
General states that "[i]f the College or any other individual
entity learns that the information is in fact being used in
contravention of the Act, the College may then notify the Attorney
General, who will then take the appropriate course of action as
provided for in Section 38-2-6 of the Act."  Id. at 2.  This
statement sent a clear message that, in April of 1994, the Attorney
General deemed section 38-2-6 to be alive and well.  Thus, the
Attorney General, far from eschewing enforcement, placed an
imprimatur upon the provision barring the use of public records for
commercial solicitation.
 To sum up, by obtaining the names of new licensees from
DBR, the Association took a significant first step along a path
blocked by the statutory proscription.  Its interest was manifest
and the parameters of the activity that it proposed to undertake
were discrete and well-defined.  Inasmuch as the statute appeared
to cover that activity, we believe it was reasonable for the
Association to infer under all the circumstances that a real
possibility of prosecution awaited if it decided to proceed.  This
is no hypothetical case; the Association had standing when it filed
suit because a sufficiently imminent threat of injury loomed.
 We add a coda.  In resisting this conclusion, the
Attorney General relies heavily on the fact that the state has
never pursued criminal charges under section 38-2-6.  His argument
has two flaws.  First, the record contains no realistic basis for
a suggestion that the statutory provision, enacted only twenty
years ago, has fallen into desuetude.  Second, predicting the
future from the past is perilous business.  There are a minimum of
three possible explanations for a history of nonenforcement:  a
statutory prohibition may have proven to be an effective deterrent,
or the proscribed behavior may be difficult to detect, or the state
may have decided not to enforce the statute.  The threat of future
prosecution varies depending on which of these theories most likely
accounts for the historical pattern.
 We consider the possibilities in reverse order.  Given
the Attorney General's advisory opinion to Rhode Island College and
the warning the Association received from DBR, it hardly can be
said that the state had disavowed enforcement of section 38-2-6.  
By like token, there is nothing in the record to suggest that
commercial solicitation somehow flies below law enforcement radar.  
Here, then, the first explanation seems by far the most plausible,
especially since the Association provides uncontradicted affidavit
support for the proposition that section 38-2-6 acts as a
deterrent.  In view of the pellucid language of the statute and the
warnings that it would be enforced, it is not illogical to assume
that this phenomenon probably accounts for the absence of prior
prosecutions.
 In all events, the Supreme Court repeatedly has found
standing to mount pre-enforcement challenges to laws that had never
been enforced.  See, e.g., United Farm Workers, 442 U.S. at 302;
Doe v. Bolton, 410 U.S. 179, 188 (1973).  We emulate these
examples.  It would be little short of perverse to deny a party
standing because the statute she challenges is so potent that no
one dares violate it, especially when the result is widespread
self-censorship.  See American Booksellers, 484 U.S. at 393.
                         B.  Ripeness.
 If standing is a question of who, then ripeness   which
shares standing's constitutional and prudential pedigree, see
Public Serv. Comm'n v. Wycoff Co., 344 U.S. 237, 242-44 (1952)   is
a question of when.  Its basic function is "to prevent the courts,
through avoidance of premature adjudication, from entangling
themselves in abstract disagreements."  Abbott Labs. v. Gardner,
387 U.S. 136, 148 (1967).  To determine whether a case is ripe for
review, a federal court must evaluate the fitness of the issue
presented and the hardship that withholding immediate judicial
consideration will work.  See id. at 149.  Thus, the plaintiff must
adduce facts sufficient to establish both fitness and hardship.  
See Ernst & Young v. Depositors Econ. Protection Corp., 45 F.3d
530, 535 (1st Cir. 1995).  These concepts are related but distinct:  
fitness "typically involves subsidiary queries concerning finality,
definiteness, and the extent to which resolution of the challenge
depends upon facts that may not yet be sufficiently developed,"
whereas hardship "typically turns upon whether the challenged
action creates a direct and immediate dilemma for the parties."  
Id. (citations and internal quotation marks omitted).
 As these preliminaries indicate, standing and ripeness
may substantially overlap.  The imbrication is nowhere more
apparent than in pre-enforcement challenges.  The existence vel non
of a credible threat of prosecution, critical to the injury-in-fact
requirement for standing, factors into both branches of the
ripeness equation.  This is as it should be, for the reasonableness
of the fear of enforcement is at the core of both standing and
ripeness.  See Adult Video Ass'n v. Barr, 960 F.2d 781, 786 (9th
Cir. 1992) ("Our conclusion that a reasonable threat of prosecution
exists, for purposes of standing, effectively dispenses with any
ripeness problem."), vacated, 509 U.S. 917 (1993), reinstated in
relevant part, 41 F.3d 503 (9th Cir. 1994); see also Socialist
Workers Party v. Leahy, 145 F.3d 1240, 1244-45 (11th Cir. 1998)
(considering ripeness and standing together in respect to a pre-
enforcement challenge).
 Despite this overlap, we assume, favorably to the
Attorney General, that both standing and ripeness are contested
here.  To establish ripeness in a pre-enforcement context, a party
must have concrete plans to engage immediately (or nearly so) in an
arguably proscribed activity.  This gives a precise shape to
disobedience, posing a specific legal question fit for judicial
review.  A showing that the challenged statute, fairly read,
thwarts implementation of the plan adds the element of hardship.
 Applying these general precepts, we have little
difficulty in concluding that the Association's claim was ripe when
filed.  This is not a case of statutory ambiguity but, rather, one
that presents a single, purely legal question:  Does Rhode Island's
prohibition on using public records for commercial solicitation
unconstitutionally restrain free expression?  The Association has
described a concrete plan to recruit new members   an activity
plainly proscribed by the text of section 38-2-6   and no one has
suggested any valid reason why resolution of the apparent conflict
should await further factual development.  Since the controversy
was well-defined and amenable to complete and final resolution, it
was fit for judicial review.
 Similarly, the Association refrained from carrying
forward its plan because it reasonably feared prosecution under
section 38-2-6.  The Association thus faced the "direct and
immediate dilemma," W.R. Grace & Co. v. EPA, 959 F.2d 360, 364 (1st
Cir. 1992), of choosing between "the Scylla of intentionally
flouting state law and the Charybdis of forgoing what [it]
believe[d] to be constitutionally protected activity," Steffel, 415
U.S. at 462.  Because lost opportunities for expression cannot be
retrieved, delaying or denying resolution of the issue would have
worked a substantial hardship.  See Duke Power Co. v. Carolina
Envt'l Study Group, Inc., 438 U.S. 59, 82 (1978).
                         C.  Mootness.
 "The rule in federal cases is that an actual controversy
must be extant at all stages of review, not merely at the time the
complaint is filed."  Steffel, 415 U.S. at 459 n.10.  Building on
this foundation, the current Attorney General argues that certain
representations made by him and his predecessor after service of
the Association's complaint defused the controversy.  Although the
Attorney General makes this argument under the heading of standing,
it is really an argument for mootness   but not a winning one.
 Mootness derives from the same constitutional and
prudential concerns as standing and ripeness.  What distinguishes
mootness is its focus on ongoing events.  Even if a justiciable
controversy exists when litigation begins, Article III requires a
federal court to depart the field if the controversy later abates,
that is, if ongoing events have wiped the slate clean or changed
the topography so that the court's opinion would be purely
advisory.  See County of Los Angeles v. Davis, 440 U.S. 625, 631
(1979); Aetna Life Ins. Co. v. Haworth, 300 U.S. 227, 240-41
(1937); see also Powell v. McCormack, 395 U.S. 486, 496 (1969)
(explaining that a case becomes moot "when the issues presented are
no longer 'live' or the parties lack a legally cognizable interest
in the outcome").
 In contrast to standing, the burden of establishing
mootness rests on the party raising the issue.  See Davis, 440 U.S.
at 631; New York State Nat'l Org. for Women v. Terry, 159 F.3d 86,
91 (2d Cir. 1998), cert. denied, 119 S. Ct. 2336 (1999).  This
burden is heavy.  See United States v. W.T. Grant Co., 345 U.S.
629, 633 (1953).  In an effort to sustain it, the Attorney General
points to several statements indicating, with varying degrees of
certitude, that the Association's planned activity falls outside
the scope of section 38-2-6.  We examine those statements.
 In the memorandum that accompanied his motion to dismiss,
Attorney General Pine admitted that the Association alleged an
intent to use licensee information "to solicit new members," but
asserted without amplification that this activity could not be
regarded as "a solicitation for a commercial purpose."  He
moderated his stance somewhat in his objection to the Association's
summary judgment motion, asserting that its proposal did "not
appear to allege a violation of  38-2-6."  Chiming the same note,
his successor states in his appellate brief that the Association's
proposed course of action "does not appear to fall within the
parameters of the commercial use prohibition."  We do not believe
that these statements render the controversy moot.
 On its face, section 38-2-6 bars the use of public
records obtained under the Act to solicit for a commercial purpose.  
This is exactly what the Association intends to do.  The Attorney
General has been careful not to concede that section 38-2-6 is
unconstitutional, and he has told at least one state agency (Rhode
Island College) that it will be enforced.  Against this backdrop,
the Attorney General must proffer more than a conclusory assertion
of inapplicability to convince us that the Association no longer
faces a credible threat of prosecution.  See Abbott Labs., 387 U.S.
at 154 (rejecting Justice Department's conclusory representation,
made after commencement of suit, as insufficient to render action
moot); cf. Dombrowski v. Pfister, 380 U.S. 479, 494 (1965) ("So
long as the statute remains available to the State the threat of
prosecutions of protected expression is a real and substantial
one.").
 The Attorney General directs us to a line of cases that
consider the authoritative interpretations of local officials in
assessing facial overbreadth challenges.  See, e.g., Forsyth County
v. Nationalist Movement, 505 U.S. 123, 131 (1992); Ward v. Rock
Against Racism, 491 U.S. 781, 795-96 (1989); City of Lakewood v.
Plain Dealer Publ'g Co., 486 U.S. 750, 770 n.11 (1988); Gooding v.
Wilson, 405 U.S. 518, 524-28 (1972).  These cases provide him
precious little comfort.  The instant statute is unambiguous and,
therefore, not readily susceptible to a narrowing construction.  
Moreover, the cautious phrasing of the Attorney General's
statements (e.g., "does not appear") is a far cry from a flat
commitment not to prosecute in this particular instance.  See
Wilson v. Stocker, 819 F.2d 943, 947 & n.3 (10th Cir. 1987)
(finding a credible threat of prosecution notwithstanding the
Attorney General's affidavit which stated that "he did not
presently believe the [plaintiff's] proposed conduct . . . was
prohibited by the statute").  Nor can the Attorney General's
litigation position be viewed as "authoritative," given his guarded
language and his office's longstanding policy against issuing
advisory opinions to private parties.
 Finally, and perhaps most telling, the Attorney General
has not furnished any plausible explanation for the suggestion that
the Association's planned enterprise somehow eludes the
proscription contained in section 38-2-6.  Cf. Wulp v. Corcoran,
454 F.2d 826, 830 (1st Cir. 1972) (finding standing where the
plaintiffs' "challenge involve[d] facial unconstitutionality
without the possibility of a limiting construction that would allow
the core of the ordinance to be upheld as constitutional"). For
this reason, the representations furnish no guidance for applying
the statute to future cases.  Even were these representations
unequivocal (and they are not), to allow the government to render
a pre-enforcement challenge to an unambiguous state statute moot
simply by declaring a case-specific amnesty would effectively
insulate unconstitutional state statutes from pre-enforcement
review.  This is simply not the law.  See Plain Dealer Publ'g, 486
U.S. at 770 n.11.
 A good illustration of how these principles ought to work
can be found in North Carolina Right to Life, 168 F.3d 705.  There,
the plaintiffs brought a pre-enforcement challenge against a
statute that on its face constrained the planned distribution of
voter guides.  See id. at 710.  In 25 years, the statutory
provisions had never been interpreted to cover issue advocacy of
this kind.  See id.  Consistent with this understanding, the state
defendants, including the attorney general, took the position that
the challenged sections did not apply to issue advocacy.  See id.  
The Fourth Circuit nonetheless found a justiciable controversy
because "the only thing standing in the way of a criminal
prosecution is the State's litigation position that it will
voluntarily refrain from enforcing the statute according to its
plain language."  Id. at 711.  This reasoning is equally applicable
to the case at bar.
 Let us be perfectly clear.  Even when state officials
fail to offer an authoritative interpretation of a state statute,
a federal court considering a pre-enforcement challenge sometimes
will presume a narrowing construction to which the law is fairly
susceptible.  See Plain Dealer Publ'g, 486 U.S. at 770 n.11.  In
this case, however, we discern no plausible narrowing construction
 and the Attorney General has pointed to none.  Because construing
the statute to exempt the Association's planned activity requires
discarding wholesale the prohibition on commercial solicitation,
the only practical way for the Attorney General to assuage a
reasonable fear of prosecution would be to disclaim, in categorical
terms, any intent to enforce the prohibition on commercial
solicitation.  See Navegar, Inc. v. United States, 103 F.3d 994,
1000 (D.C. Cir. 1997) ("Because it is clear to whom these
provisions of the Act would be applied were they to be applied at
all, the imminent threat of such prosecutions can be deemed
speculative only if it is likely that the government may simply
decline to enforce these provisions at all."); New Mexicans for
Bill Richardson v. Gonzales, 64 F.3d 1495, 1502 (10th Cir. 1995)
(permitting case to proceed because state had "not affirmatively
disavowed any intention of bringing criminal prosecution" under the
challenged statute); see also Hallandale Prof. Fire Fighters Local
2238 v. City of Hallandale, 922 F.2d 756, 760 (11th Cir. 1991)
(finding a justiciable controversy when "[a]ll that remained
between the plaintiff and the impending harm was the defendant's
discretionary decision   which could be changed   to withhold
prosecution").
                       D.  State Action.
 We turn now to the Attorney General's last argument.  His
premise   that a section 1983 suit necessitates a showing of state
action   is sound.  After all, the public/private dichotomy which
distinguishes between state action and private conduct remains a
staple of our constitutional jurisprudence.  See Perkins v.
Londonderry Basketball Club, ___ F.3d ___, ___ (1st Cir. 1999) [No.
99-1385, slip op. at 6-7].  Consequently, state action is an
indispensable ingredient of a suit which (like this one) raises a
section 1983 claim predicated on an abridgement of First Amendment
rights.  See Flagg Bros. v. Brooks, 436 U.S. 149, 155 (1978);
Rodrguez-Garca v. Dvila, 904 F.2d 90, 94 (1st Cir. 1990).
 Citing Tulsa Prof. Collection Servs. v. Pope, 485 U.S.
478 (1988), the Attorney General argues that the scenario presented
here encompasses insufficient state action to support a section
1983 claim.  This argument fails.
 In Tulsa Prof., the Court held that the operation of a
two-month limitation period for the presentation of contract claims
in probate proceedings embodies state action.  See id. at 488.  The
Justices said that the involvement of the probate court throughout
the process distinguished this nonclaim statute from self-executing
statutes of limitations, the enactment and running of which do not
implicate state action.  See id. at 486-87.  In the Attorney
General's view, section 38-2-6 is more akin to a self-executing
statute of limitations than to a probate nonclaim statute (and,
thus, does not involve state action).  We disagree.
 A substantive criminal provision carries a threat of
state action quite unlike a limitation period.  Section 38-2-6 is
such a law; it prohibits conduct and bears criminal sanctions.  The
penalties attending a violation of section 38-2-6 obviously depend
on the state mounting a prosecution, so the provision cannot be
described as "self-executing."  Furthermore, the Association
challenges not the mere enactment of section 38-2-6, but the
combination of the section's proscriptive language and the credible
threat that the state will enforce it.  Consequently, there is
ample state action to support the use of 42 U.S.C.  1983 as a
vehicle for the Association's challenge.  See, e.g., Lugar v.
Edmondson Oil Co., 457 U.S. 922, 937 (1982) (stating that an
alleged constitutional deprivation caused "by a rule of conduct
imposed by the State" can satisfy the state action requirement).
III.  CONCLUSION
 We need go no further.  At the moment of this action's
conception, the Association had standing to challenge the
commercial solicitation provision of R.I. Gen. Laws  38-2-6, and
it properly employed 42 U.S.C.  1983 as a means to that end.  The
Association's claim was ripe then and is not moot now.  
Accordingly, we reject the Attorney General's plea of
nonjusticiability and affirm the judgment below.

Affirmed.

</body>

</html>