**UNIVERSITY OF UTAH, a body corporate and politic under Utah law, and J. Bernard Machen, President of the University of Utah, Plaintiffs,**

v.

**Mark L. SHURTLEFF, Utah Attorney General, Defendant.**

**No. 2:02 CV 212 DAK.**

United States District Court,
D. Utah,
Central Division.

March 27, 2003.

jury instructions and, at worst, a dishonest rewriting of its position at trial.

**1266**

Alan L Sullivan, Todd M. Shaughnessy, Amy F. Sorenson, Kimberly A. Havlik, Snell & Wilmer LLP, Salt Lake City, UT, for plaintiffs.

Brent A. Burnett, Salt Lake City, UT, for defendant.

Brent V. Manning, Manning Curtis Bradshaw & Bednar LLC, Salt Lake City, UT, Stephen S. Dunham, Lila M. Bate-man, Morrison & Foerster LLP, Denver, CO, John R Lund, Julianne R. Blanch, Jeffrey J. Hunt, David C. Reymann, Parr Waddoups Brown Gee & Loveless, Salt Lake City, UT, for amicus.

## MEMORANDUM DECISION AND ORDER

KIMBALL, District Judge.

This matter is before the court on a Motion for Judgment on the Pleadings filed by Defendant Mark L. Shurtleff and on a Motion for Summary Judgment filed by Plaintiffs University of Utah and J. Bernard Machen. A hearing on the motions was held on October 2, 2002. At the hearing, Plaintiffs were represented by Alan L. Sullivan and Todd M. Shaughnessy, and Defendant was represented by Brent A. Burnett. Before the hearing, the court carefully considered the memoranda and other materials submitted by the parties. Since taking the matter under advisement, the court has further considered the law and facts relating to these motions. Now being fully advised, the court renders the following Memorandum Decision and Order.

### I. INTRODUCTION

In this action, Plaintiffs University of Utah (the "University") and J. Bernard Machen ("President Machen") (collectively referred to herein as "Plaintiffs") seek a judicial determination regarding a hotly contested and emotionally charged issue. The controversy concerns the validity—in light of Utah's Uniform Firearms Act ("Firearms Act") and Concealed Weapons Act—of the University's firearms policy, which prohibits the possession of concealed weapons on campus.

Specifically, Plaintiffs seek a determination by this court of three claims. First, Plaintiffs assert that the First and

Fourteenth Amendments to the United States Constitution protect the University's academic freedom and preclude application of state law to invalidate the University's firearms policy.[1] In other words, they generally claim that the University has the right to create and maintain, free from government interference, an atmosphere that is the most conducive to the uninhibited exchange of ideas among teachers and students.

Second, Plaintiffs contend that the University's rights under Article X, Section 4 of the Utah Constitution preclude application of either the Firearms Act or the Concealed Weapons Act to invalidate the University's firearms policy. They contend that Article X, Section 4 protects the University's autonomy from state interference on matters relating to the University's core mission—i.e., to protect campus order and discipline and to promote an environment consistent with the educational process.

Finally, Plaintiffs argue that neither the Firearms Act nor the Concealed Weapons Act prohibits Plaintiffs from enforcing the policy. Plaintiffs assert that these laws should be construed to permit the continued enforcement of the University's firearms policy for the foregoing constitutional reasons and because these laws should be construed narrowly to achieve their limited purposes of preventing local authorities and state agencies from adopting laws of general application that would impose criminal penalties for the possession, use, and sale of firearms.

In complete disagreement, Defendant Shurtleff (referred to herein as "Defendant" or the "Attorney General") contends that there are various threshold issues that prevent this court from adjudicating this dispute. He then argues that, even if the court can decide the dispute, all of Plaintiffs' claims fail on the merits, thus requiring dismissal of this lawsuit.

Specifically, the Attorney General argues that this court should dismiss this case without prejudice because Plaintiffs do not have standing to bring this action. Next, he claims that, even if Plaintiffs have standing, this court is without jurisdiction to consider Plaintiffs' state law claims due to his immunity under the Eleventh Amendment to the United States Constitution. If the court finds otherwise, then Defendant asserts that Plaintiffs' claims under Utah law fail on the merits.

Defendant also argues that the court does not have jurisdiction over Plaintiffs' federal constitutional claim because, according to Defendant, a political subdivision does not have authority to bring a federal suit against its parent state based on rights secured through the Fourteenth Amendment of the United States Constitution. Finally, Defendant contends that, even if the court determines that it may address the merits of Plaintiffs' federal constitutional claim, then the claim must be dismissed on the merits because the University has no First Amendment right that would prevent the state from controlling its firearms laws and because Plaintiffs have not demonstrated an affirmative link between Defendant and any violation of Plaintiffs' federal rights.

Prior to addressing the parties' arguments, the court provides some background facts. While much of the background discussed below is not material to the court's resolution of the legal issues in this case, they are provided to give context to this impassioned debate. It is important to note that the facts set forth below are not disputed by the Attorney General.

1. First Amendment rights are "protected by the due process clause of the Fourteenth Amendments from impairment by the States." *Gitlow v. People of New York,* 268 U.S. 652, 666, 45 S.Ct. 625, 69 L.Ed. 1138 (1925).

## II. BACKGROUND

### A. THE UNIVERSITY

The University is a public institution of higher education organized pursuant to the Utah Constitution and the statutes of Utah. The University's students, faculty, and staff number in excess of 44,000 people. Its main campus in Salt Lake City covers 1,522 acres and consists of a complex of classroom and office facilities, research laboratories, residential halls for both undergraduates and graduate students, athletic facilities (including a 46,000-seat football stadium and 15,000-seat indoor arena), and a number of cultural and entertainment venues, including Kingsbury Hall, Pioneer Memorial Theater, Gardner Hall, the Utah Museum of Natural History, and the Utah Museum of Fine Arts. The main campus also includes restaurants, cafeterias, daycare centers, and a preschool. The main campus is also home to a large health-care and health-sciences-research complex, which includes University Hospital (the "Hospital"), a 425-bed tertiary care public hospital. The Hospital, which serves the Intermountain West, also provides inpatient and outpatient medical services for inmates from the Utah State Prison, Salt Lake County Jail, and other correctional institutions. Some of the persons treated by the Hospital are gang members or victims of gang violence.

### B. THE UNIVERSITY'S INTERNAL POLICIES PROHIBITING THE USE AND POSSESSION OF FIREARMS ON CAMPUS

The University has prohibited students from the unauthorized possession or use of firearms on campus since approximately 1977. Section 8–10 of the University's Policy and Procedures Manual—as approved in 1977 by the University's then—governing board, the Institutional Council—prohibits *students* from possessing or using "on University premises or at University activities ... any firearm or other dangerous weapon ... unless such possession or use has been authorized by the University." In 1995, the University's Board of Trustees approved a policy on discipline and dismissal of staff. That policy, which now appears in Section 2–9 of the University's Policy and Procedures Manual, prohibits University *staff* from possessing or using "on University premises or while conducting University business off campus ... any firearms or other dangerous weapons, unless such possession or use has been authorized by the University."

Effective October 30, 1997, interim University President Jerilynn McIntyre extended the foregoing policies to prohibit possession or use on campus of firearms and other dangerous weapons by all University *employees*, including faculty. These three policies will hereinafter be referred to as the "Internal University Firearms Policy," or the "Policy." Although the Policy generally prohibits the use and possession of firearms and other dangerous weapons on campus, it contains an exception for those expressly authorized by the University to carry weapons on campus. The University does not enforce the Policy against persons visiting campus who are not students, faculty, or staff.

The University has proactively enforced the Internal University Firearms Policy. University officials have taken special steps to enforce the Policy in the University's residence halls to avoid risks of violence and accidents. University officers with responsibility for campus safety believe that the University's enforcement of the Policy has contributed significantly to the University's excellent safety record relating to gun violence and gun accidents.

### C. UTAH'S FIREARMS LAWS

At issue in this case are two statutes enacted by the Utah Legislature relating

to possession and use of firearms—the Firearms Act and the Concealed Weapons Act. The Firearms Act provides, among other things, that "[a]ll authority to regulate firearms shall be reserved to the state except where the Legislature specifically delegates responsibilities to local authorities or state entities." *See* Utah Code Ann. §§ 76–10–500 to –531 (1999 & Supp. 2001).[2]

The Concealed Weapons Act, Utah Code Annotated §§ 53–5–701 to –711 (2002), generally regulates the issuance of concealed weapons permits to Utah residents. Permits issued in accordance with the Concealed Weapons Act are, according to Utah Code Section 53–5–704(1), "valid throughout the state without restriction," except as provided by statute.

### D. SUPPORT AMONG MEMBERS OF THE UNIVERSITY COMMUNITY

The Internal University Firearms Policy enjoys strong support among members of the University community, as well as among various other local and national groups, representing a broad spectrum of interests. The University's Academic Senate—the elected faculty, students, and appointed administrator who endorse policies relating to academic life at the University—passed a resolution in 1999 approving

the University's prohibition of firearms on campus. In March 2002, the Academic Senate voted unanimously (with two abstentions) to support the University's continued adherence to the Policy.

The Policy also enjoys the unanimous support of the University Board of Trustees, the University Department of Public Safety, the University's chief Human Resources officer, the University's Director of Residential Living, the Chief Executive Officer of University Hospital and Clinics and the University of Utah Alumni Association Board of Directors. Additionally, in a response to survey of 400 current University students in 2002, a substantial majority said that they did not believe that students should be allowed to bring firearms to campus.[3]

### E. FIREARMS POLICIES OF OTHER ACADEMIC INSTITUTIONS

The Internal University Firearms Policy is consistent with and similar to firearms policies of other major universities in the United States. The purposes of such policies include (1) the preservation of academic freedom, (2) the protection of students, faculty, and staff from gunrelated accidents, crime, and suicides, and (3) the preservation of the educational process.

---

**2.** On March 19, 2003, Governor Leavitt signed into law Senate Bill 108, "Dangerous Weapons Amendments," which the Legislature had passed during the 2003 General Session. Although not effective until May 5, 2003, this act (1) amends certain provisions of the Firearms Act, (2) amends Utah Code Section 53A–11–904, "Grounds for suspension or expulsion from a public school," and (3) repeals Utah Code Section 53A–3–502, "Dangerous materials in the public schools—Class B misdemeanor—Exceptions."

**3.** The support for Plaintiffs' position is also evidenced by the filing of three amici curiae briefs, supported by the following groups: The Calvary Baptist Church, the Episcopal Diocese of Utah, the First Unitarian Church,

the Lutheran Campus Ministry, the Catholic Newman Center, the I.J. & Jeanne Wagner Jewish Community Center, the Salt Lake Society of Human Resource Management, the Utah Employers Council, the League of Women Voters of Utah, the Gun Violence Prevention Center of Utah, the American Council on Education, the American Association of Community Colleges, the American Association of Universities, the American Association of State Colleges and Universities, the National Association of State Universities and Land-Grant Colleges, Utah State University, Security on Campus, Inc., and the Hospitals & Health Systems Association, which is a trade association for the forty-eight acute and specialty hospitals and the eleven health systems currently operating in Utah.

For example, Merrill J. Bateman, President of Brigham Young University ("BYU") from 1996 until this past week, provided an affidavit in support of the Plaintiffs' Policy, stating that the President's Council—which sets BYU policy, in consultation with the BYU Police Department—promulgated the BYU Firearms and Weapons Policy, which has been in effect, in substantially similar form, since November 3, 1986. *See* Aff. of Merrill J. Bateman, attached to Pls.' Mem. in Supp. of Mot. for Summ. J. As a general matter, the BYU Firearms and Weapons Policy prohibits possession or use of firearms and weapons by faculty, staff, and students on property owned or controlled by BYU, including residence halls, with certain exceptions listed specifically in the policy itself. President Bateman stated that "BYU exercises its institutional academic freedom to create an atmosphere in its classes, assemblies, and residential living areas that is conducive to the values of its sponsor. It is the judgment of the University that BYU can best pursue that core goal of its mission by limiting the possession and use of firearms on University property to law enforcement officers." *Id.*

He further explained, "[i]t is the judgment of the University that if persons are allowed to carry firearms on University property, not only will its ability to create the atmosphere it seeks be reduced, but the risk will increase that there will be gun-related incidents that are likely to cause injury." *Id.* President Bateman also noted that "I am aware of no situation or incident that has occurred on BYU's campus that could have been alleviated by the intervention of citizens armed with concealed weapons. On the other hand, there have been situations where the presence of firearms, even in the hands of law-abiding citizens, would have complicated, escalated, and ultimately aggravated the situation or conflict." *Id.*

Similarly, for approximately 25 years, Weber State University has had a firearms policy similar to the University of Utah's. Paul H. Thompson, President of Weber State University, stated in support of Plaintiffs' motion that, among Weber State's firearms policy's purposes, is the following:

> Weber State is devoted to a tradition of vigorous debate and academic freedom of both students and faculty. The concept of academic freedom which is central to the University's mission depends upon the free exchange of ideas without threat of coercion, intimidation, or force. Together with members of the Weber State University faculty and administration who have contacted me to express their concerns, I believe that if students or faculty are permitted to carry weapons to class, or if there exists a risk that they may be carrying weapons to class, the free exchange of ideas will be chilled. In particular, discussion and debate relating to controversial topics will be stifled.

*See* Aff. of Paul H. Thompson, attached to Pls.' Mem. in Supp. of Mot. for Summ. J. President Thompson also declared that

> I believe that the carrying of firearms on campus will increase the risk of injury to students, faculty, and staff from accident or gun violence. In this respect, I am particularly concerned about the possible presence of firearms in the University's classrooms and residence halls. If persons are allowed to carry firearms on campus, the physical safety of students, faculty and staff will be significantly compromised.

*Id.*

Westminster College in Salt Lake City also prohibits the carrying of firearms by students, faculty, and staff. According to Westminster College's President, Peggy A. Stock:

From its beginning, our campus has believed in a sense of community where peaceful discourse and vigorous debate are core values of academic freedom. Firearms or weapons of any kind have no place here. The Board of Trustees and I, as well as the rest of our academic community believe that having weapons on campus would cause people to feel threatened or intimidated. They would no longer feel secure in sharing their views with others or engaging in controversial discussions.

*See* Aff. of Peggy A. Stock, attached to Pls.' Mem. in Supp. of Mot. for Summ. J.

Snow College, in Ephraim, Utah, also prohibits students, faculty, and staff from carrying firearms on campus. Its President, Michael T. Benson, stated that

the concept of academic freedom central to the College's mission depends upon the free exchange of ideas without threat of coercion, intimidation, or force. Together with other members of the Snow College administration, I believe that if students or faculty are permitted to carry weapons to class, or if there exists the risk that they may be carrying weapons to class, the exchange of ideas will be stifled..... Another reason behind Snow College's policies against the carrying of firearms on campus relates to safety.

*See* Aff. of Michael T. Benson, attached to Pls.' Mem. in Supp. of Mot. for Summ. J.

Additionally, Idaho State University's firearms policy is closely similar to University of Utah's Policy. Idaho State's President, Richard L. Bowen, noted that one of its firearms policy's purposes is to preserve "a safe working and education environment ... in which faculty are free to teach and students are free to learn and express their views without fear of physical harm." *See* Aff. of President Richard L. Bowen, attached to Pls.' Mem. in Supp. of Mot. for Summ. J.

Plaintiffs have also provided evidence that the University's Internal University Firearms Policy is entirely consistent with policies prohibiting firearms on campus at colleges and universities nationwide. *See* Aff. of Leonard C. Beckum, attached to Pls.' Mem. in Supp. of Mot. Summ. J.

**F. THE ATTORNEY GENERAL'S OPINION AND PUBLIC ANNOUNCEMENT**

Defendant is the duly elected Attorney General of the State of Utah. Among his duties is the constitutional duty to be the legal advisor to Utah's state officers. By statute, he has the responsibility to "give the attorney general's opinion in writing and without fee to the Legislature or either house, and to any state officer, board, or commission, and to any county attorney or district attorney, when required, upon any question of law relating to their respective offices." Utah Code Ann. § 67–5–1(7) (2000). A formal opinion of the Attorney General, given pursuant to this statute, "constitutes the Attorney General's carefully[ ] considered judgment as to what the law requires in the circumstances presented," but it "has no legal binding effect on the requesting officer." Attorney General Policy Manual § 5.10(d)(2), attached as Ex. E to Def.'s Mem. Supp. J. on the Pldgs.

On October 26, 2001, the President of Utah's Senate and the Speaker of its House of Representatives requested a formal opinion from Attorney General Shurtleff as to the validity under Utah law of Utah's Department of Human Resource Management's ("DHRM") Rule 477–9–1(5), which prohibited state employees from carrying firearms "in any facility owned or operated by the state, or in any vehicle, or at any time or any place while on state business." On November 30, 2001, the Attorney General responded by issuing Utah Attorney General's Opinion

No. 01–002 ("Opinion No. 01–002" or the "Opinion"). The Attorney General determined that the rule was unenforceable, stating that the DHRM rule contravened the Utah Uniform Firearms Act because it purports to "regulate firearms" without specific authorization from the Legislature. *See* Opinion No. 01–002.

In a highly publicized footnote to that opinion, the Attorney General wrote that the DHRM rule "may not be the only rule that had been promulgated without authorization from the Legislature." *Id.* at 4 n. 13. The Attorney General noted that the letter requesting his opinion on the DHRM rule had, as an attachment, Formal Opinion No. 98–01 from the Office of Legislative Research and General Counsel ("OLRGC"), and that the OLRGC had concluded that the University of Utah's policy prohibiting students and faculty from possessing firearms on University premises was contrary to law. *Id.* The Attorney General stated that "I agree with the reasoning and conclusions of the Legislative General Counsel that those policies are unlawful and in violation of the laws of this State." *Id.*

Since the issuance of Opinion No. 01–002, the Attorney General has repeatedly stated in public and in the press that the Internal University Firearms Policy violates Utah law and is invalid. The Attorney General has been quoted in the press as stating that the University campus would be safer if concealed weapons were allowed. He has made public statements to members of the University community, arguing that the Policy violates "the rule of law . . . ." He has also been quoted by the press as stating that the Policy is "null and void." On at least one occasion, the Attorney General has publicly stated that the Policy does not prevent concealed weapons permit holders from carrying guns on the University campus.

### G. EVENTS TRANSPIRING AFTER THE ATTORNEY GENERAL'S DETERMINATION

Soon after the release of Opinion No. 01–002, on January 14, 2002, the Administrative Rules Review Committee, which consists of Utah legislators, voted to recommend to the entire Utah Legislature that the Internal University Firearms Policy not be "reauthorized." The Legislature then enacted Senate Bill No. 170, which targeted that portion of the Policy that prohibits students from carrying firearms on campus, as well as comparable policies adopted by other State institutions of higher education. The bill provided that these policies are "administrative rules" that would not be "reauthorized." [4] In addition, certain members of the Utah Legislature proposed, during the 2002 General Session, legislation that would have permitted the Legislature's executive appropriations committee to reduce a State agency's administrative budget by up to 50% based on a determination that the agency's policies violate a State statute. The purpose of this proposal, which was defeated in the Utah House of Representatives, was to punish the University for upholding the Policy in the face of the Attorney General's opinion.

Since the spring of 2000, some students at the University have expressed to President Machen and other University officials their desire to carry firearms on campus, notwithstanding the Policy. Some have indicated that they intend to carry firearms on campus as a result of the Attorney General's opinion.

---

**4.** The effect of this legislative action is unclear because the reauthorization procedure appears to apply to "rules" rather than "policies." However, whether the University's Internal University Firearms Policy is subject to the reauthorization provisions under the Utah Administrative Procedures Act is an issue not before the court.

Similarly, employees of the University have, during the years 2001 and 2002, threatened to bring firearms on campus notwithstanding the Policy. These employees have told University officials that they believe that the Policy violates the law and is unenforceable, and therefore they intend to disobey it.

## H. THE DANGER OF FIREARMS ON CAMPUS

President Machen has concluded that, if members of the University community are allowed to carry firearms on campus, then the physical safety of students, faculty, and staff will be significantly compromised. He determined that the presence of firearms on campus will inevitably lead to an increase in the number of gun-related accidents, crimes, and suicides.

In addition, Ben L. Lemmon, the University's Director of Public Safety and Chief of Police, has concluded that the presence of firearms on campus will significantly increase the risk of accidents from guns, particularly in venues where large numbers of young people congregate, such as at Rice Eccles Stadium, in residence halls, in the University's libraries, at the Huntsman Center, and at other locations. Similarly, the University's Director of Residential Living, Daniel E. Adams, has also determined that the presence of firearms on campus would increase the risk of serious injury from accidental or intentional use of firearms.

Lawrence J. Meyer, M.D., until recently the President of the University's Academic Senate, has concluded that the presence of firearms on campus will have an adverse impact on the ability of faculty members to teach, particularly in large classes, and would have an adverse impact on the University's ability to attract first-rate faculty. Additionally, Loretta Harper, Vice President of Human Resources for the University, has concluded that, if University staff members are allowed to carry firearms to work as a matter of course, then the risk of injury from accidents or gun violence will increase dramatically.

Finally, the Attorney General has not disputed Plaintiffs' contention that the research of medical and social science experts in the United States confirms the judgment of the foregoing University officials. That research has shown: (1) that there is a strong correlation between the increased availability of firearms and rates of homicide, suicide, and unintentional firearm death; (2) that, among college students nationwide, there exists a strong correlation between gun ownership and substance abuse; (3) that an overwhelming majority of citizens in the United States believe that citizens should not be allowed to carry firearms on college campuses, in hospitals, or in sports stadiums, and (4) that women, minorities, and persons who are not owners of guns are more likely to feel less safe, as other members of their communities obtain firearms. *See* Pls.' Mem in Supp. of Mot. for Summ. J. at xiv.

## III. STANDARD OF REVIEW

A trial court's decision regarding whether it has subject matter jurisdiction is a question of law. *Salt Lake Tribune Pub. Co., LLC v. AT & T Corp.,* 320 F.3d 1081, 1095 (10th Cir.2003). A decision on a motion for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure is considered under the same standard of review applicable to a Rule 12(b)(6) motion. Accordingly, the court accepts the well-pleaded allegations of the complaint as true and construes them in the light most favorable to the plaintiff. *Ramirez v. Department of Corrections,* 222 F.3d 1238, 1240 (10th Cir. 2000) (citation omitted).

When the procedural posture of the case is a motion for summary judgment under Rule 56 of the Federal Rules of Civil Pro-

cedure and a plaintiff's standing is at issue, "to prevail on such a motion[,] a plaintiff must establish that there exists no genuine issue of material fact as to justiciability, and mere allegations of injury, causation, and redressability are insufficient." *Essence, Inc. v. City of Federal Heights,* 285 F.3d 1272, 1280 (10th Cir.2002) (internal quotation marks omitted).

In the instant action, Defendant filed a motion for judgment on the pleadings, challenging the allegations set forth in Plaintiffs' Complaint. The parties have assumed that the lower standard of review applicable to Rule 12(c) motions applies in this case. In responding to Defendant's Motion for Judgment on the Pleadings, however, Plaintiffs have relied on affidavit testimony, which was provided in conjunction with their Motion for Summary Judgment. Thus, for the reasons set forth below, the court finds that they would prevail on the standing issue under either standard of review.

The standard of review pertaining to Plaintiffs' Motion for Summary Judgment is that summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In reviewing the factual record, we construe all facts and make reasonable inferences in the light most favorable to the non-moving party. *See Byers v. City of Albuquerque,* 150 F.3d 1271, 1274 (10th Cir.1998).

## IV. DISCUSSION

Because there are many threshold issues in this case—such as whether Plaintiffs have standing to bring this action and whether this court can exercise jurisdiction over Plaintiffs' claims—the court will begin by addressing the preliminary issues of Plaintiffs' standing and whether Defendant has Eleventh Amendment immunity on Plaintiffs' state law claims.

### A. STANDING

Defendant contends that Plaintiffs lack standing to bring this action because they have failed to establish (1) that they have been injured; (2) that there is a causal connection between any alleged injury and Defendant's actions; and (3) that their alleged injuries would be remedied by a favorable decision.

Those seeking to invoke the jurisdiction of the federal courts must demonstrate that they have standing to bring their lawsuit. *See United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.,* 517 U.S. 544, 551, 116 S.Ct. 1529, 134 L.Ed.2d 758 (1996); *Phelps v. Hamilton,* 122 F.3d 1309, 1316 (10th Cir. 1997). The standing doctrine limits federal judicial power and has both constitutional and prudential components. *See United Food,* 517 U.S. at 551, 116 S.Ct. 1529; *Board of County Comm'rs v. Geringer,* 297 F.3d 1108, 1111 (10th Cir.2002). Under Article III of the United States Constitution, federal judicial power extends only to cases or controversies, requiring "as an 'irreducible minimum' that there be (1) an injury in fact, (2) a causal relationship between the injury and the challenged conduct, and (3) a likelihood that the injury will be redressed by a favorable decision." *United Food,* 517 U.S. at 551, 116 S.Ct. 1529; *see also Faustin v. City & County of Denver, Colo.,* 268 F.3d 942, 947 (10th Cir.2001). The essence of the constitutional dimension of standing is "whether the plaintiff has alleged such a personal stake in the outcome of the controversy [as] to warrant his invocation of federal-court jurisdiction and to justify exercise of the

court's remedial powers on his behalf." *Village of Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 260–61, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977) (alteration in original) (internal quotation marks omitted).

In addition to this triad of constitutional requirements, the prudential component of standing encompasses several judicially self-imposed limits on the exercise of federal jurisdiction. *See United Food*, 517 U.S. at 551, 116 S.Ct. 1529. These limits include "the general prohibition of a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked." *Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984); *see Geringer*, 297 F.3d at 1112. Under the prudential standing inquiry, "a party that has satisfied the requirements of constitutional standing may nonetheless be barred from invoking a federal court's jurisdiction." *Geringer*, 297 F.3d at 1112.

Together, the constitutional and prudential components of standing ensure that plaintiffs possess "such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions." *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962); *see City of Los Angeles v. Lyons*, 461 U.S. 95, 101, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983).

In the instant case, Defendant does not take issue with the prudential limitations on standing, and, in any event, the court finds that Plaintiffs have satisfied the prudential requirements.[5] Defendant, however, contends that none of the three constitutional requirements of standing has been met in this case, and therefore, this action must be dismissed. Accordingly, the court will address each of the three constitutional standing requirements in turn.

---

5. Although Defendant argues that the University does not have "authority" to sue the state under 42 U.S.C. § 1983, he does not—in any of his briefs—raise this issue in connection with his standing arguments. There is Tenth Circuit authority indicating that "political subdivision" standing should be addressed along with, or prior to, the constitutional and prudential standing requirements. *See Geringer*, 297 F.3d at 1112–14 & n. 1. But, this court declines to address "political subdivision" standing as a threshold inquiry in this case for at least two reasons. First, Plaintiffs have asserted state law claims for which the University's "political subdivision" standing to sue is not disputed. Second, Defendant's "political subdivision" standing argument is inextricably intertwined with the merits of Plaintiffs' federal constitutional claim, which cannot be addressed at this juncture for the reasons set forth later in this opinion.

Specifically, the Tenth Circuit has determined that municipalities and counties may not sue a state for alleged violations of the Fourteenth Amendment because that Amendment "was written to protect individual rights, as opposed to collective or structural rights." *Branson Sch. Dist. v. Romer*, 161 F.3d 619, 628–29 (10th Cir.1998). However, if this court should determine, for example, that the University—which is arguably different from a "municipality" or a "county"— indeed has a First and Fourteenth Amendment right to academic freedom, then *Branson* arguably would not compel the result sought by Defendant, and Plaintiffs would have standing to bring their federal constitutional claim. Making such a determination on the "political subdivision" standing issue, however, would essentially provide Plaintiffs with all the relief they seek in this action because Defendant has not challenged Plaintiffs' contention that a First and Fourteenth Amendment right of academic freedom, if one is found to exist, would protect the Internal University Firearms Policy.

### 1. *Injury in Fact*

■ Defendant argues that Plaintiffs have failed to allege an injury. He claims that, at best, Plaintiffs identify merely a difference of opinion with Utah's Attorney General as to the nature and scope of Utah's firearms laws. Defendant claims that there have been no factual allegations made as to any action that he has taken, is taking, or has threatened to take against Plaintiffs. Specifically, he claims that Plaintiffs have not alleged in their Complaint any facts concerning what type of civil or criminal liability Defendant may have sought to impose.

"To establish an injury-in-fact, plaintiffs must show an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *American Civil Liberties Union v. Johnson,* 194 F.3d 1149, 1154 (10th Cir.1999); *see also Essence Inc. v. City of Federal Heights,* 285 F.3d 1272, 1281 (10th Cir.2002). The injury must be distinct and palpable. *Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984). However, Plaintiffs need not "await the consummation of threatened injury to obtain preventive relief. If the injury is certainly impending, that is enough." *Babbitt v. United Farm Workers Nat'l Union,* 442 U.S. 289, 298, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979); *see also United States v. Colorado S.Ct.,* 87 F.3d 1161, 1166 (10th Cir.1996) (recognizing that " '[o]nce the gun has been cocked and aimed and the finger is on the trigger, it is not necessary to wait until the bullet strikes to invoke the Declaratory Judgment Act.' ").

Contrary to Defendant's assertion, threats of criminal prosecution or civil liability are not the only qualifying injuries under this prong of the standing analysis. *See, e.g., Pierce v. Society of Sisters,* 268 U.S. 510, 534–36, 45 S.Ct. 571, 69 L.Ed. 1070 (1925) (finding that the appellees had standing to challenge a state statute prior to its effective date where state officials had publicly announced their opinion as to the statute's validity, and enforcement would unreasonably interfere with the appellees' patrons and appellees' business and property); *Ward v. Utah,* 321 F.3d 1263, 1266 (10th Cir.2003) (recognizing that "[p]laintiffs may have standing even if they have never been prosecuted or actively threatened with prosecution."); *American Civil Liberties Union v. Florida Bar,* 999 F.2d 1486, 1492 (11th Cir.1993) (determining that the plaintiff had standing to challenge a Florida Bar Rule when he showed a reasonable fear of disciplinary action). With these principles in mind, this court must determine whether Plaintiffs have demonstrated an injury in fact sufficient to invoke the jurisdiction of this court.

■ First, the Attorney General's conclusion has led or threatens to lead to a violation of Plaintiffs' claimed First Amendment right of academic freedom. In the First Amendment context, a plaintiff generally has standing when he has "alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by statute, and there exists a credible threat of prosecution thereunder." *Babbitt,* 442 U.S. at 298, 99 S.Ct. 2301.

In this case, Plaintiffs have clearly established an intention to engage in a course of conduct that is arguably affected with a constitutional interest, and, according to the Attorney General, such conduct violates the law, and there exists a credible threat of harm to Plaintiffs if they continue to engage in the allegedly unlawful conduct. Specifically, Defendant's determination that the Internal University Firearms Policy is contrary to law has subverted Plaintiffs' authority to enforce a policy that

it arguably has a constitutional right to enforce.

For example, Defendant's determination has triggered legislative efforts to nullify or prevent enforcement of the Policy. Approximately six weeks after the Attorney General issued the Opinion, the Administrative Rules Review Committee, which consists of Utah legislators, voted to recommend to the entire Utah Legislature that the Policy not be "reauthorized." The Legislature then enacted Senate Bill No. 170, which targeted that portion of the Policy that prohibits students from carrying firearms on campus, as well as comparable policies adopted by other state institutions of higher education. The bill provided that these policies are "administrative rules" that would not be "reauthorized."

In other words, the Attorney General's opinion prompted the Legislature to pass a statute purporting to invalidate the University's Policy and directly undermining it. The effect of the Legislature's action is uncertain,[6] but it, coupled with the Attorney General's public pronouncements concerning the alleged invalidity of the Policy, have nonetheless legitimized the belief of some students and employees that they may carry concealed weapons on campus. This is conduct that the University claims to have a constitutional right to prohibit. Thus, the Attorney General's conduct, in challenging the authority of the University to impose restrictions relating to firearms, has deprived or threatens to deprive the University of its claimed First Amendment right to establish the conditions under which learning will occur on its campus.

Second, aside from the harm to Plaintiffs' alleged First Amendment right to academic freedom, Plaintiffs have also established a credible threat of financial harm. The Attorney General's conclusion prompted the Utah Legislature to attempt to take injurious action against the University for maintaining its allegedly unlawful Policy. During the 2002 General Session, certain members of the Utah Legislature proposed legislation, in reliance on the Attorney General's conclusion, that would have permitted the Legislature's Executive Appropriations Committee to reduce a state agency's administrative budget by up to fifty percent based on a determination that the agency's policies violate a state statute. The purpose of this proposal, which was narrowly defeated in the Utah House of Representatives, was to punish the University for allegedly flouting the law by upholding the Internal University Firearms Policy in the face of the Attorney General's opinion.

Although this proposal was defeated, it demonstrates that, without court resolution of the Plaintiffs' claims in this case, the University will operate under the constant and credible threat of the Legislature's taking action against it.[7] Consequently, Plaintiffs' concern that the Attorney General's opinion may be used as a basis for some type of legislative action against the University is not conjectural or hypothetical.

Finally, the mere threat of the Attorney General's filing a civil declaratory judgment action would arguably suffice to establish an injury in fact. The fact that

6. As stated above, this issue is not before the court.

7. While the actions of the Legislature during the 2003 General Session are not before the court, the court notes that at least some attempt was made to keep agencies from making policies and/or rules that are contrary to

state law. *See* Amy Joi Bryson, *"Power Struggle Brewing on Hill,"* DESERET NEWS, December 8, 2002, at B1. While the outcome of this effort is not known to the court, it is clear that this controversy between the University and the Legislature will continue until resolved by a court.

Plaintiffs prevailed over Defendant in the race to the courthouse does not undermine Plaintiffs' threat of injury. Indeed, the Attorney General had publicly discussed bringing a declaratory judgment action to resolve this controversy. In other words, if Plaintiffs had not filed the instant action first, it is almost certain that the Attorney General would have filed suit himself.[8] Because there is no reason to think that the Attorney General would allow Plaintiffs to enforce their Policy without consequence or resolution, and because it is clear that Plaintiffs intend to enforce the Policy despite the Attorney General's conclusion that the Policy violates the law, the court finds that Plaintiffs have alleged an invasion of a legally protected interest that is concrete and particularized, actual or imminent, and not conjectural or hypothetical.

### 2. Causal Connection

To satisfy this element, a plaintiff must allege that the injury is "fairly traceable" to the challenged action of the defendant, rather than some third party not before the court. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992); *Bennett v. Spear*, 520 U.S. 154, 162, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997).

Defendant argues that Plaintiffs cannot establish a causal connection between the alleged injury and the actions of the Attorney General. He claims that the conduct Plaintiffs seek to stop has been caused by third parties—University students and employees and the Utah Legislature—who are not before the court. The Attorney General claims that the fact that he "has opinions on state law does not create a causal connection with the independent actions of third persons."

To the contrary, however, the court finds that the injuries described above flow directly from the Attorney General's issuance of his formal opinion on the validity of the University's Internal University Firearms Policy and from his repeated public statements concerning that Policy. The portion of the Policy that restricted students from carrying firearms had been in place for over twenty-five years and it apparently went virtually unnoticed and unopposed until the Attorney General issued Opinion No. 01–002. Since the issuance of that Opinion, the Attorney General has repeatedly stated in public and in the press that the Policy cannot be enforced. He has been quoted in the press as stating that the University campus would be safer if concealed weapons were allowed and that the University's Policy is "invalid," "null and void," and violates the "rule of law." He has made these statements to an audience of University students and faculty. On at least one occasion, the Attorney General has publicly stated that, as a re-

---

**8.** Quite clearly, this is not a case in which the Attorney General has disavowed his intention of enforcing his interpretation regarding the Firearms Act. *See Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 302, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979) (noting that the state had not disavowed any intention of enforcement); *Ward v. State of Utah*, 321 F.3d at 1268 (10th Cir.2003) (finding that the plaintiff had standing in part because he had been given no assurances that he would not be charged under the same statute again); *PETA v. Rasmussen*, 298 F.3d 1198, 1203 (10th Cir.2002) (concluding that PETA did not have standing because the defendants admitted that they misinterpreted the challenged statute to apply to the plaintiff's conduct in the past, and the plaintiff had not indicated an intention to violate the statute as currently interpreted by the defendants); *American Civil Liberties Union v. Florida Bar*, 999 F.2d 1486, 1493 (11th Cir.1993) (noting that "[w]e are not troubled by the pre-enforcement nature of this suit. The State has not suggested that the newly enacted law will not be enforced, and we see no reason to assume otherwise.").

sult of its alleged legal infirmities, the Policy should not prevent concealed weapons permit holders from carrying guns on the University campus.

In support of his position, Defendant relies on *Sherman v. Community Consolidated School District*, 980 F.2d 437 (7th Cir.1992). That reliance is misplaced. The court in *Sherman* did not address the issue of standing. Instead, the court dismissed claims against the Illinois Attorney General because he had immunity under the Eleventh Amendment. In that case, the Attorney General had done nothing to connect himself to the plaintiffs' claims. He had never threatened plaintiffs with prosecution, he appeared to the court to have no authority to do so, and there were other proper defendants. *See id.* at 440–41.

Similarly, Defendant's discussion of *1st Westco Corp. v. School District of Pennsylvania*, 6 F.3d 108 (3rd Cir.1993) is unavailing. Defendant contends that the court in *Westco* found that an Attorney General could not be sued for issuance of a non-binding opinion. However, in that case, the Attorney General and the Secretary of Education were dismissed because neither had the authority or duty to enforce the statute in question, and neither had attempted or given any indication that they intended to do so. *Id.* at 113. In fact, the statute at issue in *Westco* specifically charged the school district, not the Attorney General or the Secretary of Education, with enforcing the statute. *Id.* Thus, the case is entirely different from the instant action.

In this case, Plaintiffs have demonstrated that the alleged interference with its claimed constitutional right of academic freedom is "fairly traceable" to the Attorney General's conduct. Plaintiffs are not requesting that this court enjoin the Utah Legislature, nor do Plaintiffs seek to enjoin the conduct of the University's students or employees. Rather, Plaintiffs seek a declaration that the Attorney General's legal opinion concerning the enforceability of the Policy is wrong and that Plaintiffs may lawfully enforce the Policy.

■ Moreover, in this case, even if Plaintiffs' injuries were not fairly traceable to the Attorney General, they would still have standing. "Under United States Supreme Court precedent, when a plaintiff challenges the constitutionality of a rule of law, it is the state official designated to enforce that rule who is the proper defendant, even when that party has made no attempt to enforce the rule." [9] *American Civil Liberties Union v. Florida Bar*, 999 F.2d 1486, 1490 (11th Cir.1993) (citing *Diamond v. Charles*, 476 U.S. 54, 64, 106 S.Ct. 1697, 90 L.Ed.2d 48 (1986)); *see also Doe v. Bolton*, 410 U.S. 179, 188–89, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973) (finding a justiciable controversy between doctors challenging an abortion law and the state attorney general); *Mobil Oil Corp. v. Attorney General of Va.*, 940 F.2d 73, 76 (4th Cir.1991) (finding a case or controversy between a plaintiff bringing a pre-enforcement challenge and a state attorney general because the attorney general has enforcement authority); *Wilson v. Stocker*, 819 F.2d 943, 947 (10th Cir.1987) (same); *Schulz v. Williams*, 44 F.3d 48, 61 (2nd Cir.1994) ("It is well-settled that a state official may properly be made a party to suit seeking to enjoin enforcement of an allegedly unconstitutional act if that official plays some role in the enforcement of that act.").

9. The court finds it immaterial that Plaintiffs have framed their request for relief in terms of seeking a declaration that, among other things, they have a constitutional right to enforce the Internal University Firearms Policy, as opposed to requesting that the court declare that the statutes in question are unconstitutional as applied to Plaintiffs.

In *Wilson*, the Tenth Circuit reasoned that "a controversy exists not because the state official is himself a source of injury, but because the official represents the state whose statute is being challenged as the source of the injury." 819 F.2d at 947. Thus, the *Wilson* court found that a "plaintiff challenging the constitutionality of a statute has a sufficiently adverse legal interest to a state enforcement officer" to create a substantial controversy when "the plaintiff shows an appreciable threat of injury flowing directly from the statute." *Id.*

Here, the Attorney General has determined that the Policy violates the law, and he represents the state whose statutes are being challenged as the source of the injury. Unlike various statutes that name a specific official to enforce the law, there is no such specificity in the statutes at issue in this case. Thus, it is the Attorney General who is responsible for enforcing the law. Indeed, the Attorney General must, with certain exceptions not applicable here, "prosecute or defend all causes to which the state, or any officer .... of the state in an official capacity is a party; and take charge, as attorney, of all civil legal matters in which the state is interested." [10] *See Utah Code Ann.* § 67–5–1(2) (2000). Similarly, he must "institute and prosecute proper proceedings in any court of the state or of the United States, to restrain and enjoin corporations organized under the laws of this or any other state ... from acting illegally or in excess of their corporate powers or contrary to public policy...." *Id.* § 67–5–1(13). Even this court's local rules of practice recognize the role of the Attorney General in represent-

ing the interests of the state when a plaintiff challenges the constitutionality of a statute. *See* DUCivR 24–1(b).

If Plaintiffs could not sue the Attorney General, it is entirely unclear who they could sue or how they could ever obtain a judicial determination regarding this controversy. Accordingly, for the foregoing reasons, the court finds that Plaintiffs have satisfied the causation element of standing because their injuries are fairly traceable to Defendant and because, in any event, he is the proper defendant in this action.

### 3. Redress from Defendant

To establish this element of standing, Plaintiffs must demonstrate that it is "likely," as opposed to merely "speculative," that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). Defendant argues that no relief entered against Defendant would remedy the injuries that Plaintiffs allege have been or will be inflicted on them. He argues that a judgment against the Attorney General would not prevent students or employees from bringing independent challenges to the validity of the Internal University Firearms Policy, nor would it stop students or employees from ignoring the Policy, nor would any judgment against him affect the authority of the Utah Legislature to enact whatever state firearms laws that it determined are appropriate.

The court disagrees that a favorable decision would not resolve the present controversy. A determination that Plaintiffs

---

**10.** As a result, Utah courts have found that the Attorney General is a proper defendant in a declaratory judgment action because the Attorney General "is the chief legal officer of the State, and charged with the duty of representing its interests." *See Parker v. Rampton*, 28 Utah 2d 36, 497 P.2d 848, 852–53 (1972);

*see also Hansen v. Barlow*, 23 Utah 2d 47, 456 P.2d 177 (1969); *Utah Code Ann.* § 78–33–11 (2002) (providing that if a party challenges a statute, the attorney general shall be served with a copy of the proceeding and be entitled to be heard).

may lawfully enforce the Policy would remove the ambiguity concerning the validity of the Policy. A favorable decision would bring clarity to students, faculty, and employees—and the Utah Legislature—that the Internal University Firearms Policy is lawful and that it may be enforced. While a court's resolution of this dispute will not necessarily prevent students, faculty, or employees from violating the Policy, it would certainly eliminate any legitimate basis for their actions and would empower Plaintiffs to enforce the Policy. Similarly, the court's declaration would necessarily prevent the Attorney General from using the authority of his office to challenge the University's right to enforce the Policy. Finally, while a favorable decision on the constitutional issues would not change the authority of the Utah Legislature to enact appropriate firearms laws, it would eliminate any basis for penalizing Plaintiffs for maintaining their Policy. Accordingly, the court finds that the requested declaratory relief would redress the injuries suffered by Plaintiffs.

### 4. Summary Concerning Standing

This court finds that Plaintiffs have standing to bring this action because they have demonstrated several actual or threatened injuries that are fairly traceable to Defendant's conduct, and which would likely be redressed by a favorable decision. There is no doubt that Plaintiffs are "seriously interested in disobeying, and the defendant seriously intent on enforcing the challenged measure." *American Civil Liberties Union v. Florida Bar*, 999 F.2d 1486, 1492 (11th Cir.1993) (quoting *International Soc'y for Krishna Consciousness v. Eaves*, 601 F.2d 809, 818 (5th Cir.1979)). This action presents a classic case or controversy within the meaning of Article III of the United States Constitution.

Having determined that Plaintiffs have standing to maintain this action, the court will now address their claims against Defendant.

### B. STATE LAW CLAIMS

Plaintiffs assert two claims that arise under the laws of the State of Utah. First, they seek a determination that, as a matter of state law, the University of Utah has the autonomy to adopt and enforce its own firearms policies, even if those policies are contrary to the laws enacted by the Utah Legislature. Second, Plaintiffs assert that neither the Firearms Act nor the Concealed Weapons Act bars enforcement of the Internal University Firearms Policy because (a) the Policy does not "regulate firearms," as that phrase is used in the statutes relied upon by the Attorney General, (b) neither statute was designed to interfere with the right of the University to prohibit its students, faculty, and staff from carrying firearms on campus, and (c) these statutes should be interpreted in harmony with the University's statutory and common law duties toward students, faculty, and staff, because the Legislature has conferred on the University the duty and authority to provide its students and employees a safe learning and working environment.

Defendant disagrees with these assertions, but argues first that this court is without jurisdiction to make any determinations regarding these state law claims because the Eleventh Amendment and principals of federalism preclude this court from instructing a state officer on how to conform his conduct to state law.

■ As a general proposition, the Eleventh Amendment bars suits against states and their agencies in federal court. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). Specifically, it provides that "[t]he Judicial power of the United States shall not be construed to extend to any

suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. The United States Supreme Court has found that, "despite the limited terms of the Eleventh Amendment, a federal court cannot entertain a suit brought by a citizen against his own state." *Id.* (citing *Hans v. Louisiana,* 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890)). The Court determined that federal jurisdiction over suits against unconsenting states "was not contemplated by the Constitution when establishing the judicial power of the United States." *Id.* (quoting *Hans,* 134 U.S. at 15, 10 S.Ct. 504).

■ While this immunity of the state extends to its employees when they are sued in their official capacities, an exception is normally made permitting a plaintiff to sue a state official for prospective equitable relief based on federal law. *Ex Parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908); *Verizon Md. Inc. v. Public Serv. Comm'n,* 535 U.S. 635, 122 S.Ct. 1753, 1760, 152 L.Ed.2d 871 (2002); *Lewis v. New Mexico Dep't of Health,* 261 F.3d 970, 975 (10th Cir.2001). In *Lewis,* the Tenth Circuit set forth four requirements that must be met to allow a case to proceed against state officials: (1) the plaintiffs are suing state officials, rather than the state itself; (2) the plaintiffs have alleged a non-frivolous violation of federal law; (3) the plaintiffs seek prospective equitable relief, rather than retroactive monetary relief from the state treasury; and (4) the suit does not implicate "special sovereignty interests." 261 F.3d at 975. Plaintiffs in this action have satisfied these requirements regarding their federal claim.

■ Defendant does not contend otherwise, but rather, he argues that this court cannot address Plaintiffs' state law—as opposed to federal law—claims. State law

claims "are not cognizable in a proceeding under *Ex Parte Young* because state officials continue to be immunized from suit in federal court on alleged violations of state law brought under the federal court's supplemental jurisdiction." *Earles v. State Bd. of Certified Pub. Accountants of La.,* 139 F.3d 1033, 1039 (5th Cir.1998); *see also Lewis,* 261 F.3d at 975. The Tenth Circuit, in *ANR Pipeline Co. v. Lafaver,* 150 F.3d 1178 (10th Cir.1998), recognized that, because of the important interests of federalism and state sovereignty implicated by the *Ex Parte Young* doctrine, the rule has limits. *Id.* at 1188. One of those limits is that "federal courts have no jurisdiction to entertain a suit that seeks to require the state official to comply with state law-only allegations of violations of federal law are sufficient to come within the *Ex Parte Young* rule." *Id.* Indeed, as the United States Supreme Court has explained:

> A federal court's grant of relief against state officials on the basis of state law, whether prospective or retroactive, does not vindicate the supreme authority of federal law. On the contrary, it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law. Such a result conflicts directly with the principles of federalism that underlie the Eleventh Amendment.

*Pennhurst,* 465 U.S. at 106, 104 S.Ct. 900.

[8] Plaintiffs do not contest this statement of the law but instead claim that the Attorney General has waived his Eleventh Amendment immunity. Specifically, Plaintiffs contend that the Attorney General publicly invited this action, welcomed the opportunity to have the state law issues resolved, and also affirmatively requested that the court resolve the state law issues in his favor in the same motion in which he

argues that this court does not have jurisdiction over those claims. Thus, by requesting that this court consider and dismiss the state court claims on the merits, Plaintiffs argue that the Attorney General has invoked the court's subject matter jurisdiction and has thus waived any Eleventh Amendment immunity he might have possessed.

■ However, "[t]here must be an 'unequivocal intent' to waive the immunity." *Sutton v. Utah State Sch. for the Deaf and Blind*, 173 F.3d 1226, 1234 (10th Cir.1999) (quoting *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 241, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985)). It is well settled that "the mere fact that [a defendant] has appeared in [a] suit, without explicitly invoking Eleventh Amendment immunity, does not, by itself, constitute a waiver of Eleventh Amendment immunity." *Mascheroni v. Board of Regents*, 28 F.3d 1554, 1560 (10th Cir.1994); *see also Amisub (PSL), Inc. v. State of Colo. Dept. of Social Servs.*, 879 F.2d 789, 793 (10th Cir.1989) (finding that "[t]he State has not 'expressly stated' by its silence that it has waived Eleventh Amendment immunity. Neither can we say that participation in this suit is an effective waiver."); *Richins v. Industrial Constr., Inc.*, 502 F.2d 1051, 1055–56 (10th Cir.1974) (concluding that the Eleventh Amendment could not be waived by the attorney general of the state by entering an appearance and litigating in the case); *Elephant Butte Irrigation Dist. v. Department of Interior*, 160 F.3d 602, 607 (10th Cir.1998) (recognizing that "[t]he fact the state appeared and contested this case in the proceedings below does not indicate consent to suit under the Eleventh Amendment"). The Tenth Circuit has repeatedly demonstrated "a preference for an approach giving full effect to the Eleventh Amendment *absent some extraordinarily*

*effective waiver.*" *Richins*, 502 F.2d at 1055 (emphasis added); *Sutton*, 173 F.3d at 1234.

In the instant case, there has been no express or implied waiver. Although the Attorney General has talked in public about resolving this issue in a "friendly lawsuit," there is no evidence—or even an allegation—that the Attorney General invited this action to be filed in *federal* court.[11] Rather, the extent of the Attorney General's conduct has been to appear in and litigate the merits of this case. As set forth above, the Tenth Circuit has specifically determined that such actions do not constitute a waiver of Eleventh Amendment immunity. Accordingly, the court concludes that, regarding Plaintiffs' state law claims, the Attorney General is immune from suit in federal court. Thus, the court cannot address the merits of Plaintiffs' state law claims, and those claims are dismissed without prejudice.

C. JUSTICIABILITY OF PLAINTIFFS' FEDERAL CONSTITUTIONAL CLAIM

■ The Attorney General's immunity in this court from Plaintiffs' state law claims has ramifications that were apparently unappreciated by the parties in this case and were recognized only recently by the court. Having decided that this court cannot, under *Pennhurst* and its progeny, exercise jurisdiction over Plaintiffs' state law claims, the court is left in the frustrating position of having jurisdiction over a meaty federal constitutional claim that could be rendered moot by a favorable state court decision on either of Plaintiffs' state law claims. Although this court had hoped and was prepared to resolve this heated controversy, two federal jurisprudential principles compel this court's abstention from deciding the federal constitu-

---

11. Thus, the court need not consider whether a public invitation to file suit in federal court would constitute a waiver of Eleventh Amendment immunity.

tional question until the state court decides Plaintiffs' state claims.

■ First, "one of the most firmly established and respected doctrines in our jurisprudence" is that "federal constitutional issues should be avoided where other grounds of decision are available." *Cuesnongle, O.P. v. Ramos*, 835 F.2d 1486, 1495 (1st Cir.1987); *see also Siler v. Louisville & Nashville R.R. Co.*, 213 U.S. 175, 191–93, 29 S.Ct. 451, 53 L.Ed. 753 (1909) (stating that, if a case can be decided on either of two grounds, a constitutional ground versus a statutory or common law ground, the court will decide only the latter); *Pennhurst*, 465 U.S. at 159–63, 104 S.Ct. 900 (Stevens, J., dissenting) (collecting cases applying the *Siler* rule); *Mills v. Rogers*, 457 U.S. 291, 305, 102 S.Ct. 2442, 73 L.Ed.2d 16 (1982) ("It is this Court's settled policy to avoid unnecessary decision of constitutional issues."); *ANR Pipeline Co. v. Lafaver*, 150 F.3d 1178, 1186 n. 8 (10th Cir.1998) (stating that "[f]ederal courts should avoid reaching the merits of a constitutional issue when the case may be decided on statutory grounds."). This principle is supported by the prohibition against advisory opinions. *See Mills v. Rogers*, 457 U.S. 291, 305, 102 S.Ct. 2442, 73 L.Ed.2d 16 (1982). "The oldest and most consistent thread in the federal law of justiciability is that federal courts will not give advisory opinions." 13 Charles A. Wright, Arthur R. Miller, & Edward H. Cooper, *Federal Practice & Procedure*, § 3529.1 (2d ed.1984); *United Pub. Workers of Am. (C.I.O.) v. Mitchell*, 330 U.S. 75, 89, 67 S.Ct. 556, 91 L.Ed. 754 (1947) ("As is well known[,] the federal courts established pursuant to Article III of the Constitution do not render advisory opinions.").

■ Second, a corollary of this principle is that "unsettled questions of state law must be resolved before a substantial federal constitutional question can be decided." *Ramos*, 835 F.2d at 1495–96 (quoting *Hawaii Housing Authority v. Midkiff*, 467 U.S. 229, 236, 104 S.Ct. 2321, 81 L.Ed.2d 186 (1984)); *see also Railroad Comm'n v. Pullman Co.*, 312 U.S. 496, 500, 61 S.Ct. 643, 85 L.Ed. 971 (1941). Accordingly, "if a state statute might be construed so as to moot or alter materially the constitutional questions, then the state law question should be resolved first." *Ramos*, 835 F.2d at 1496.

While the court recognizes that federal courts have a "virtually unflagging obligation .... to exercise the jurisdiction given them," *Colorado River Water Conservation District v. United States*, 424 U.S. 800, 817, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976), "certain exceptional circumstances warrant abstention by a federal court from the exercise of its proper jurisdiction." *Id.* at 813–19, 96 S.Ct. 1236; *Pustell v. Lynn Pub. Schools*, 18 F.3d 50, 53 (1st Cir.1994); *S & S Pawn Shop, Inc. v. City of Del City*, 947 F.2d 432, 442 (10th Cir.1991). This case presents one of those exceptional circumstances. Abstention is required not only because the Utah statutes at issue could possibly be construed so as to moot the federal constitutional claim, but also because the state court would be able to decide unsettled questions of law that are of unique local concern, thereby permitting the federal court to avoid needless friction with state policies.

The United States Supreme Court addressed a similar situation in *Railroad Commission v. Pullman Co.*, 312 U.S. 496, 500, 61 S.Ct. 643, 85 L.Ed. 971 (1941). In *Pullman*, the Court established that, when a constitutional question is premised on an unsettled question of state law, the federal court should postpone adjudication of the case while a separate action is adjudicated in state court. *Id.* at 500, 61 S.Ct. 643. The Court found that *Pullman* demonstrates a "scrupulous regard for the right-

ful independence of the state governments and for the smooth working of the federal judiciary." *Id.* at 501, 61 S.Ct. 643 (internal quotations omitted). Thus, the *Pullman* abstention doctrine "serves the dual aims of avoiding advisory constitutional decisionmaking, as well as promoting the principles of comity and federalism by avoiding needless federal intervention into local affairs." [12] *See Pustell,* 18 F.3d at 53 (citing 17A Charles A. Wright, Arthur R. Miller and Edward H. Cooper, *Federal Practice and Procedure,* § 4242 (1988)).

■ Under *Pullman* abstention, "a district court should abstain if three prerequisites are met: (1) an uncertain issue of state law underlies the constitutional claim; (2) the state law issues are amenable to interpretation and such an interpretation may obviate or substantially narrow the need for a federal court ruling on the constitutional issue; and (3) an incorrect decision of state law by the district court would hinder important state policies." *Lehman v. City of Louisville,* 967 F.2d 1474, 1478 (10th Cir.1992).

In the instant action, uncertain issues of state law underlie the federal constitutional claim, and their resolution by the state court may obviate the need for a federal court ruling on the constitutional issue. If the state court ruled favorably on Plaintiffs' statutory construction claim or their state constitutional claim, there would be no need for a federal court ruling on Plaintiffs' First and Fourteenth Amendment claim. Thus, the first two requirements of *Lehman* are satisfied. The third *Lehman* requirement, however, fails to contemplate a situation in which a federal district court is precluded under *Pennhurst* from addressing the state law claims. Even if the court were to determine that it would not unduly trample on state affairs or policies by resolving Plaintiffs' state law claims, this court is nevertheless precluded under *Pennhurst* from addressing the state law claims. Consequently, the court finds that the *Lehman* criteria for *Pullman* abstention are satisfied. [13]

■ As the court has noted above, *Pullman* abstention is the postponement of jurisdiction, not its abdication. *Allen v. McCurry,* 449 U.S. 90, 101 n. 17, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980). Accordingly, this court will retain jurisdiction over Plaintiffs' federal claims so that Plaintiffs can avoid having to file a new federal case, if necessary, after the state court rulings. [14]

12. *Pullman* abstention may be raised *sua sponte* by the court. *Bellotti v. Baird,* 428 U.S. 132, 143–44 n. 10, 96 S.Ct. 2857, 49 L.Ed.2d 844 (1976); *Friedman v. Board of County Comm'rs,* 781 F.2d 777, 791 n. 4 (10th Cir.1985).

13. If resolution of the state law issues in this case were clear, the court would be navigating uncharted waters. *See, e.g., Ramos,* 835 F.2d at 1489–99 (recognizing the dilemma posed by the competing demands of Pennhurst, *Siler,* and *Pullman* and noting that a new variant of *Pullman* abstention has been suggested in that *Pennhurst* immunity would itself trigger *Pullman*-type abstention). However, not only is this court precluded from addressing the state law claims, but those claims pose legitimate state law questions, the resolution of which is not clear.

14. This court is aware that certification of these claims to the state's highest court is generally the preferable procedure under *Pullman* abstention. *See, e.g., Arizonans for Official English v. Arizona,* 520 U.S. 43, 75–76, 79, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997). However, this court cannot certify claims over which it has no jurisdiction. Thus, the court must follow the more traditional *Pullman* procedure and dismiss without prejudice Plaintiffs' state law claims, directing Plaintiffs to file those claims in the appropriate state court, and retaining jurisdiction over Plaintiffs' federal claim, should adjudication of the federal claim become necessary after the state court litigation.

*See Pullman,* 312 U.S. at 501–02, 61 S.Ct. 643; *Pustell,* 18 F.3d at 54–55. Further, because the issues have been fully briefed in this court, no further briefing will be needed—or permitted—if it becomes necessary for this court to adjudicate the federal constitutional claim.

## V.  CONCLUSION

For the foregoing reasons, IT IS HEREBY ORDERED that Defendant's Motion for Judgment on the Pleadings [docket entry # 5] is GRANTED in part and DENIED in part. Plaintiffs' Motion for Summary Judgment [docket entry # 9] is DENIED in part and STAYED in part. Plaintiffs' state law claims are dismissed without prejudice due to Defendants' Eleventh Amendment immunity in this court. As to Plaintiffs' remaining claim-the federal constitutional claim—the court ABSTAINS from decision under *Railroad Comm'n of Texas v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941) until the state court decides Plaintiffs' state law claims. Plaintiffs are directed to file their state law claims in the appropriate state court within 60 days.

This court hereby RETAINS JURISDICTION over Plaintiffs' federal constitutional claim. The Clerk of the Court is directed to administratively close this action pending resolution of the state court litigation, reserving to any party the right to move to re-open this matter, if necessary, within 20 days of the final resolution of the state court litigation.